**STATE of Maine**

v.

**Michael GLEASON.**

Supreme Judicial Court of Maine.

July 31, 1979.

Henry N. Berry, III, Dist. Atty., Peter G. Ballou (orally), Deputy Dist. Atty., William Keefe, Law Student (orally), Joanne S. Sataloff, Asst. Dist. Atty., Portland, Glenn Robinson, Law Student Intern, George Schelling, Law Student Intern, for plaintiff.

Shortill & Shortill by Thomas F. Shortill (orally), John M. Shortill (orally), Sanford, for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY, GODFREY and NICHOLS, JJ.

NICHOLS, Justice.

For the first time since the Maine Juvenile Code [1] took effect on July 1, 1978, we encounter a challenge to the constitutionality of the new Code. The fourteen-year-old juvenile, Michael Gleason, in these two appeals, consolidated for argument, has launched a broad-gauged attack upon the procedures embodied in this Code.

We conclude that the Maine Juvenile Code retains the beneficent and basically rehabilitative purposes of our prior law relating to juveniles. Fundamental fairness, after all, does not require identical procedures for dealing with juvenile crimes and adult crimes.

We, therefore, deny both his appeals.

Just before midnight on October 4, 1978, a Portland police officer, Douglas Cole, noticed certain suspicious circumstances at Nick's Variety Store in that city. He investigated and then radioed for assistance. This juvenile, Michael Gleason, was apprehended by another officer as he emerged from a window of that store. The proprietor of that store subsequently found that two six-packs of beer were missing from the cooler.

On October 5, 1978, this juvenile was ordered held in detention pending an adjudication on the offense of burglary (17–A M.R.S.A. § 401) by the District Court, sitting as the Juvenile Court, in District Nine. At that hearing it was urged on behalf of this juvenile that the procedures there used violated the Maine and United States Constitutions by (1) including no finding of probable cause to believe that the juvenile had committed the offense; (2) affording him no rights of confrontation, cross-examination, compulsory process and counsel; (3) failing to adequately preserve the right to bail, and (4) denying him the right against self-incrimination. He also challenged certain relevant portions of 15 M.R.S.A. § 3203 (Supp.1978) as unconstitutionally vague.

On the same day this juvenile appealed from the order of detention to the Superior Court in Cumberland County. A month later, on November 6, 1978, he was released from detention to the custody of his mother. Four more days went by and the Superior Court dismissed this appeal as moot. On November 15, 1978, this juvenile filed his notice of appeal to this Court from such dismissal in the Superior Court.

On November 21, 1978, in Juvenile Court this juvenile was adjudicated guilty of the offense charged. At the outset of the hearing his constitutional right to a jury trial and his right to have the matter first presented to a grand jury for possible indictment were argued in his behalf. Three days later, he filed his appeal to Superior Court from this adjudication in Juvenile Court.

On November 28, 1978, following a disposition hearing this juvenile was sentenced to the Maine Youth Center for an indefinite period, but to terminate no later than his eighteenth birthday on June 20, 1982. It is now contended in his behalf that such a sentence violates constitutional due process and equal protection since, taken in con-

---

1. 15 M.R.S.A. § 3001 et seq. (Supp.1978).

junction with 15 M.R.S.A. §§ 3314, 3316 and 3317 (Supp.1978), the Maine Juvenile Code permits the imposition upon a juvenile of a sentence longer than that which may lawfully be imposed upon an adult for the same offense. He appealed to the Superior Court from this order on November 30, 1978.

By order of January 19, 1979, the Superior Court reaffirmed its dismissal of this juvenile's appeal from the order of detention and denied both the appeal from the adjudication of his commission of the offense and the appeal from the disposition imposed.

On January 25, 1979, this juvenile appealed to this Court from that order.

I

Jurisdictional questions confront us at the threshold. The State contends that the order of detention was an interlocutory order, reviewable on appeal, but not properly appealable itself, because it was not a final judgment. M.R.Civ.P. 73. *See generally* 3 H. Glassman, *Maine Practice* § 37.3 (1967); 2 R. Field, V. McKusick & K. Wroth, *Maine Civil Practice* § 73.2 (1970). This juvenile responds that jurisdiction of that appeal

**2.** 15 M.R.S.A. § 3401 (Supp.1978) provides in pertinent part:

 1. Jurisdiction of juvenile appeals.

 A. Judgments of the juvenile court in juvenile matters shall be reviewable by the Superior Court.

 B. Judgments of the Superior Court in juvenile matters shall be reviewable by the Law Court.

15 M.R.S.A. § 3402 (Supp.1978) provides in pertinent part:

 1. Final orders. Upon claim properly filed, review shall be had of any final order of the court. A "final order" includes but is not limited to:

 A. Any order finding presence or absence of jurisdiction over the matter in question.

 B. Any order which terminates juvenile court jurisdiction in favor of another court;

 C. Any order terminating or modifying custodial rights;

 D. Any order of disposition after adjudication;

 E. Any order modifying any of the above;

 F. Any order denying a stay of judgment or release on bail; or

 G. An order of adjudication

 . . . . .

was conferred upon this Court and the Superior Court, notwithstanding the final judgment rule, by 15 M.R.S.A. §§ 3401 and 3402 (Supp.1978).[2] He contends that the order of detention was a "final order" as there defined and, therefore, appealable.

We do not reach this jurisdictional question since, under the circumstances, it would not affect our disposition of this appeal.

 The final judgment rule is directed against piecemeal review; that danger is not present in this case. *See DiBella v. United States,* 369 U.S. 121, 124, 82 S.Ct. 654, 656, 7 L.Ed.2d 614 (1962); *Cobbledick v. United States,* 309 U.S. 323, 325, 60 S.Ct. 540, 541, 84 L.Ed.2d 783, 785 (1940); *Allen v. Cole Realty, Inc.,* Me., 325 A.2d 19, 21 (1974); *State v. Brown,* 75 Me. 456 (1883).

This juvenile cautiously appealed at the time the order was originally entered as well as following the adjudication and disposition. Which of these appeals was validly taken need not be decided in order to determine that upon one of them the question has been properly brought before this Court.[3]

 Custodial rights were broadly defined in *Burge v. City and County of San Francisco,* 41 Cal.2d 608, 262 P.2d 6 (1953) as including the right to direct a child's activities, education, and health care and to control his services and earnings. *See also Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 559 (1972). The extent of the modification of those rights necessary to trigger appealability may legitimately be disputed.

 Commenting on Standard 2.1 of the *Standards Relating to Appeals and Collateral Review, Tent. Draft* (1977) by the Juvenile Justice Standards Project of the Institute of Judicial Administration and the American Bar Association, which 15 M.R.S.A. § 3401 tracks in large part, states that an order "terminating or modifying custodial rights" includes "an order detaining a juvenile in a custodial environment pending final adjudication on the merits of a delinquency petition." *Id.* at 21.

 Similarly whether an order of detention denies release on bail is a debatable issue. *Cf.* 15 M.R.S.A. § 942 (Supp.1978) (permitting petition for review of refusal to grant bail before Superior Court).

**3.** We note that the importance of a determination of. the precise scope of appellate review pursuant to 15 M.R.S.A. § 3402 has been large-

As a second jurisdictional issue we must consider the rationale of the Superior Court justice who dismissed for mootness this juvenile's appeal from the order of detention following his release from that detention on November 6, 1978.

■ Firmly fixed is the rule that courts should decline to decide issues which by virtue of valid and recognizable supervening circumstances have lost their controversial vitality. Such cases are moot. *Good Will Home Ass'n. v. Erwin*, Me., 285 A.2d 374, 379 (1971). This rule is founded on the policies of avoidance of the useless expenditure of judicial resources, maintenance of flexibility in the law and prevention of premature intrusion into policy-making areas best left to the legislature. Note, 88 *Harv. L.Rev.* 373, 375 (1974). *See also Bennett v. State*, Me., 289 A.2d 28, 32 (1972) (decision of questions of no practical consequences should not be permitted to burden courts). The test is whether there remain sufficient practical effects flowing from the resolution of this litigation to justify the application of limited judicial resources.

■ Application of this test to specific cases has produced several exceptions to the rule of mootness, as well-recognized as the basic rule itself. First, the court will determine whether sufficient collateral consequences will result from determination of the questions presented so as to justify relief. *See Bennett v. State, supra; Sibron v. New York*, 392 U.S. 40, 53–55, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). Second, while technically moot in the immediate context, questions of great public interest may nevertheless be addressed for the future guidance of the bar and of the public. *See King Resources Co. v. Environmental Improvement Com'n.*, Me., 270 A.2d 863, 870 (1970); *East Meadow Community Concerts Ass'n. v. Board of Education*, 18 N.Y.2d 129, 272 N.Y.S.2d 341, 344, 219 N.E.2d 172, 174

(1966). Third, issues which may be repeatedly presented to the trial court, yet escape review at the appellate level because of their fleeting or determinate nature, may appropriately be decided. *See Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 125–126, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974); *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *cf. Good Will Home Assoc. v. Erwin, supra*, at 380.

This juvenile questions a broad range of the procedures for review of an order of detention under 15 M.R.S.A. § 3203(5).

He argued to the Juvenile Court that portions of this statute are unconstitutionally vague, that he was denied a fair hearing on the issue of probable cause for pretrial detention with the rights of assistance of counsel, of confrontation of witnesses and compulsory process, that the right to refuse to testify against oneself was denied him, and that the failure of the statute to provide for release on bail was unconstitutional. These questions clearly are of considerable public interest because they are involved in every proceeding for the review of detention ordered by a juvenile intake worker pursuant to 15 M.R.S.A. § 3203(4). The public has a fundamental interest in assuring that the guarantees of both the state and federal constitutions are fully respected in any judicial proceedings.

Nevertheless, the public interest in decision of the question whether a determination of probable cause must precede a continued detention has been diminished by the enactment of P.L., 1979, c. 512, § 3, which added a sub-paragraph to 15 M.R.S.A. § 3203(5) (Supp.1978), effective September 13, 1979, providing:

D. No continued detention shall be ordered unless the juvenile court shall determine that there is probable cause to believe that the juvenile has committed a

---

ly vitiated by P.L.1979, c. 512, § 9 (effective September 13, 1979) which repeals that section and enacts in its place a new section, in pertinent part providing:

1. Appeals of the following matters may be taken from the juvenile court to the Superior Court by a party specified in subsection 2.

D. A detention order or any refusal to alter an order for changed circumstances entered pursuant to section 3203, subsection 5, for abuse of discretion, provided that the appeal shall be handled expeditiously.

juvenile crime. That determination shall be made on the basis of evidence, including reliable hearsay evidence, presented in testimony or affidavits.

The question of whether a probable cause determination prior to continued detention was mandated under prior law is no longer of general public interest and is mooted by that change in the Maine Juvenile Code.

■ We limit our consideration to the other questions raised by the juvenile with respect to his detention prior to the adjudication which remain of great public interest and, therefore, properly reviewable despite the elements of mootness which are present.[4]

## II

The issues raised by the juvenile on this appeal require us to consider the fundamental principles governing constitutionally valid differences between juvenile proceedings and adult criminal proceedings. The validity of these differences is founded on the judicial recognition of the different goals and attitudes of society in response to the criminal behavior manifested by adults and juveniles.

Construing the prior juvenile statutes in Maine, this Court had occasion to observe:

The benevolent purposes intended by our statute, 15 M.R.S.A. § 2501 et seq., to provide for our juvenile offenders that care, custody and discipline as nearly as possible approximating that which they should receive from their parents or guardians, and as far as practicable treatment commensurate with their status not as criminals but as young persons in need of aid, encouragement and guidance may still be obtained within the protective channels of due process. *Shone v. State*, Me., 237 A.2d 412, 417 (1968).

Similarly, the United States Supreme Court has explained the function and development of the separate juvenile justice system:

The early reformers were appalled by adult procedures and penalties, and by the fact that children could be given long prison sentences and mixed in jails with hardened criminals. They were profoundly convinced that society's duty to the child could not be confined by the concept of justice alone. They believed that society's role was not to ascertain whether the child was "guilty" or "innocent," but "What is he, how has he become what he is, and what had best be done in his interest and in the interest of the state to save him from a downward career." The child—essentially good, as they saw it—was to be made "to feel that he is the object of [the state's] care and solicitude," not that he was under arrest or on trial. The rules of criminal procedure were therefore altogether inapplicable. The apparent rigidities, technicalities, and harshness which they observed

---

4. In analogous circumstances the following decisions have reached the same conclusion. *People ex rel. Wayburn v. Schupf*, 39 N.Y.2d 682, 385 N.Y.S.2d 518, 519, 350 N.E.2d 906, 908 (1976); *People ex rel. Guggenheim v. Mucci*, 32 N.Y.2d 307, 344 N.Y.S.2d 944, 945, 298 N.E.2d 109, 110 (1973); *Doe v. State*, Alaska, 487 P.2d 47, 53 (1971).

While a habeas corpus action might have been a proper avenue of relief under these circumstances, *see Baldwin v. Lewis*, 300 F.Supp. 1220 (E.D.Wis.1969); *People ex rel. Guggenheim v. Mucci, supra*, the application of such relief is dependent upon the unavailability of other appellate remedies. *Fulwood v. Stone*, 129 U.S.App.D.C. 314, 317, 394 F.2d 939, 942 (1967). With the adoption of the Maine Juvenile Code provisions relating to appellate review, there is at least considerable uncertainty as to the appealability of the order of detention. *See* 15 M.R.S.A. § 3402 (Supp.1978), set forth

in fn. 2 *supra. See also Stack v. Boyle*, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951) (habeas corpus relief not appropriate where amount of bail set violated constitutional standards). *Fernandez v. Monge*, 586 F.2d 848 (1st Cir. 1978) (class action brought); *Cooley v. Stone*, 134 U.S.App.D.C. 317, 414 F.2d 1213 (1969) (order appealable in District of Columbia). In these circumstances we would be reluctant to penalize a juvenile for the procedural defaults of his attorney, if there were such, in light of the historic concern of our courts for the welfare of minors and the rehabilitative goals of juvenile proceedings even if habeas corpus relief was the appropriate avenue for relief. *See Fulwood v. Stone, supra*, 129 U.S.App.D.C. at 317, 394 F.2d at 942. Therefore, we need not and do not, decide which remedy is proper and would normally govern the granting of relief from an illegal order of detention.

in both substantive and procedural criminal law were therefore to be discarded. The idea of crime and punishment was to be abandoned. The child was to be "treated" and "rehabilitated" and the procedures, from apprehension through institutionalization, were to be "clinical" rather than punitive. *In re Gault*, 387 U.S. 1, 15–16, 87 S.Ct. 1428, 1437, 18 L.Ed.2d 527, 539 (1967).

In the same case the Court further noted that a traditional justification for state intervention, as *parens patriae*, where parents default in effective performance of their custodial function, lay in the particular circumstances of a juvenile—he is entitled, unlike an adult, " 'not to liberty, but to custody.' " *Id.* at 17, 87 S.Ct. at 1438, 18 L.Ed.2d at 540. Thus civil proceedings shorn of criminal procedural safeguards were found to be appropriately employed to alter a juvenile's custody.[5]

Without minimizing these ideals and goals, fundamentally fair procedures remain the primary and indispensable foundation of individual freedom and must be employed in juvenile proceedings. *Id.* at 20, 87 S.Ct. at 1439, 18 L.Ed.2d at 542.

■■■ Accordingly, the restraints on a juvenile's liberty imposed pursuant to the Maine Juvenile Code require a proceeding governed by the fundamental fairness which is constitutionally mandated. The precise nature of the procedures the Maine and United States Constitutions demand depends upon the nature, purpose and effect of the proceedings. *See Shone v. State*, Me., 237 A.2d 412, 417 (1968); *People ex rel. Wayburn v. Schupf*, 39 N.Y.2d 682, 385 N.Y. S.2d 518, 520, 350 N.E.2d 906, 909 (1976); *Kent v. United States*, 383 U.S. 541, 562, 86 S.Ct. 1045, 1057, 16 L.Ed.2d 84, 97–98 (1966).

A wooden approach, characterizing the Juvenile Court proceeding as "civil" or "criminal," avails us little. Rather, we must review the context of juvenile proceedings in a comprehensive fashion to de-

termine the requirements of due process in the circumstances. *McKeiver v. Pennsylvania*, 403 U.S. 528, 541, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971); *In re Terry*, 438 Pa. 339, 265 A.2d 350, 354 (1970) (jury trial right not fundamental right in juvenile context). *Cf. Secretary of Public Welfare of Pennsylvania v. Institutionalized Juveniles*, —— U.S. ——, 99 S.Ct. 2523, 61 L.Ed.2d 142 (June 20, 1979). Procedural strictures are not constitutionally imposed where they would jeopardize the essential elements of the State's purpose in creating juvenile courts. *See In re Winship*, 397 U.S. 358, 375, 90 S.Ct. 1068, 1078, 25 L.Ed.2d 368, 381 (1970) (Harlan, J. concurring).

■■■ More recent decisions of this Court and the United States Supreme Court have shown that the procedural safeguards constitutionally required in adult criminal proceedings must be afforded a juvenile unless they would "compel the States to abandon or displace any of the substantive benefits of the juvenile process." *In re Winship, supra*, at 367, 90 S.Ct. at 1074, 25 L.Ed.2d at 377. Normal adult criminal procedures must be afforded to the extent consistent with the basic rehabilitative purposes of the juvenile justice system. *State in Interest of H. M. T.*, 159 N.J.Super. 104, 387 A.2d 368, 371 (1978); *see also* Comment, *Rehabilitation as the Justification of a Separate Juvenile Justice System*, 64 *Calif.L.Rev.* 984, 995 (1976).

In analyzing the scope of the procedural due process to be accorded a juvenile, we must ascertain at the threshold whether the State retains a rehabilitative purpose in the establishment of a specialized system of juvenile justice.

The Legislature expressly set forth its purposes in enacting the Maine Juvenile Code:

The purposes of this Part are:

A. To secure for each juvenile subject to these provisions such care and guidance, preferably in his own home, as will best

---

5. *See generally* F. Miller, R. Dawson, G. Dix, R. Parnas, *The Juvenile Justice Process* 1–51 (2d ed. 1976).

serve his welfare and the interests of society;

B. To preserve and strengthen family ties whenever possible, including improvement of home environment;

C. To remove a juvenile from the custody of his parents only when his welfare and safety or the protection of the public would otherwise be endangered or where necessary to punish a child adjudicated, pursuant to chapter 507, as having committed a juvenile crime;

D. To secure for any juvenile removed from the custody of his parents the necessary treatment, care, guidance and discipline to assist him in becoming a responsible and productive member of society;

E. To provide procedures through which the provisions of the law are executed and enforced and which will assure the parties fair hearings at which their rights as citizens are recognized and protected. 15 M.R.S.A. § 3002(1) (Supp.1978).[6]

■ These purposes continue the goals of rehabilitation and treatment which have historically characterized the juvenile justice system in Maine. Preservation of home and family ties is a goal of the new Juvenile Code. It further seeks to secure for any juvenile treatment, care, guidance and discipline to assist him in becoming a responsible and productive member of society. These goals and purposes are substantially the same as those underpinning the prior treatment of juveniles.

Under the Maine Juvenile Code, an adjudication of the commission of a juvenile crime is not deemed a conviction of a crime, and it does not lead to the civil disabilities which conviction of an adult crime may entail. 15 M.R.S.A. § 3310(6).

■ Proceedings under the new Code retain as much informality as is permitted by the state and federal constitutions. The flexibility of the dispositional alternatives and the criteria for selection of the proper disposition demonstrate the compassion which the Legislature still has in large measure for the welfare of the juvenile. These are the substantive benefits justifying separate treatment of these offenders. *See* 15 M.R.S.A. §§ 3313, 3314.

■ Another provision of the new Code shows that these goals were intended to be implemented from the moment that a juvenile is taken into custody and to have a continuing role throughout later proceedings. 15 M.R.S.A. § 3203(7) (Supp.1978). That provision ordains strict segregation of juveniles from adult offenders in jails or other secure facilities. In recommending the adoption of this strict rule, Maine's Commission to Revise Statutes Relating to Juveniles set forth in some length its views on the importance of such segregation. Those views underscore the solicitude which the draftsmen of the Juvenile Code had for juvenile offenders.[7]

6. *Cf. Uniform Juvenile Court Act* § 1, 9 U.L.A. 400 (1973).

7. A child in jail is very much alone. His physical surroundings are strange and may be fearsome; his trust in his family and other adults is undermined; and his own stability is shaken. In addition to enduring the anxiety of abandonment to, and dependence on, potentially hostile strangers and the sadness that accompanies the loss of trust in adults experienced by most jailed children, they also feel stigmatized. Their self-image is altered.

In most jails, there is absolutely nothing for children to do. They experience an overwhelming sense of boredom. Such enforced idleness is very painful for adolescents. They become restless and irritable. They may feel confused and disoriented. They may be unable to concentrate, unable to think clearly. If so, they will be frightened.

They are also frustrated. Generally children do not view themselves as lawbreakers in a significant sense. Neither do they see themselves as dangerous. They see the police as overreacting to their behavior. To a juvenile, the criminal justice system appears unable to appropriately respond to his behavior.

We don't know the permanent effects on children of the experience of being jailed. At age forty, are they more prone to depression? To suicide? To homicide? We don't know. But we do know that it is immediately and substantially harmful for juveniles to be jailed with adults.

Jailing children makes them frightened, sad, lonely and angry. Some children are resilient. Some of them will be all right. But by jailing children with adults, we make it more likely that some will grow up rebellious, hostile, aggressive and violent.

582

Finally, and especially, we note that in an atmosphere far less punitive and coercive than that of the adult prison system, the State maintains at the Maine Youth Center a program intended to foster the rehabilitation of juveniles placed there. The State's rehabilitative purposes is tangibly demonstrated in the statutes creating and governing the operation of the Maine Youth Center. *See* 15 M.R.S.A. §§ 2711 *et seq.* (Supp. 1978).[8]

 There is, admittedly, an element of deterrence through restraint in the approach of the Maine Juvenile Code, but this is found to some degree in all juvenile systems.[9] So long as rehabilitation remains the primary goal, and so long as it is not destructive to the fact-finding process, certain informality in the juvenile procedures is appropriate and simplified procedures in juvenile matters are a legitimate objective for such a Code as this.[10]

In summary, it cannot be said that under the Maine Juvenile Code the young offender is treated in an essentially punitive manner for the violation of a criminal statute. The benevolent purposes of our prior juvenile laws remain uppermost. Our Code creates a separate and distinctive juvenile justice system designed primarily for the reha-

bilitation, not the punishment, of the young offender.

## III

As we now consider in turn this juvenile's specific challenges to the procedures of the Juvenile Court, we must in each instance ascertain whether the procedural safeguard he demands is constitutionally mandated, and we must determine whether the requirement of such a safeguard would result in the abandonment or displacement of any of the substantive benefits of our juvenile justice system.

First of these contentions is that this juvenile was unconstitutionally denied the right to be released on money bail, both pending the adjudication hearing and again pending this appeal.

 The Maine Juvenile Code does not proscribe release on money bail. In permitting release "[u]pon such other prescribed conditions as may be reasonably related to securing the juvenile's presence in court" the Code impliedly empowers the Juvenile Court to release a juvenile on simple money bail. 15 M.R.S.A. § 3203(4)(B)(4).

We need not, and we do not, reach the issue raised by the State as to whether the

The Commission therefore recommends that, in order to ensure that children and youth are never detained in adult jails, the state establish a group of regionalized small detention facilities which are physically separate and distinct from adult jails. These centers should provide staff and services that are sensitive to the needs of the young people they detain. Maine's Commission to Revise Statutes Relating to Juveniles, *Summary of Preliminary Report* 35–36 (1976).

8. 15 M.R.S.A. § 2712 (Supp.1978) provides in pertinent part:

The State shall maintain the institution located at South Portland, heretofore known as the Boys Training Center, and hereby renamed the Maine Youth Center, to rehabilitate children committed thereto as juvenile offenders by the courts of the State. Toward this end, the disciplines of education, casework, group work, psychology, psychiatry, medicine, nursing, vocational training and religion related to human relations and personality development shall be employed. The center shall be coeducational and shall fully

separate the housing facilities for boys and girls.

9. *Cf. S\*\*\*\* S\*\*\*\* v. State*, Me., 299 A.2d 560, 568 (1973) (basic and primary idea is salvation, not punishment). W. Sheridan, *Standards for Juvenile and Family Courts* 1 (1966).

10. The Legislature has taken a stricter approach in its treatment of juveniles at the adjudicatory stage. *See* 15 M.R.S.A. §§ 3307, 3314(1)(D). However, when we balance the interest of the state in an effective juvenile justice system against the interest of the juvenile in the safeguards of due process, we conclude that the Maine Juvenile Code retains the substantive benefits crucial to maintenance of this separate system of juvenile justice.
· For a discussion of recent radical surgery to New York's juvenile law which now in large measure treats serious juvenile crime very much as in the adult criminal system (in sharp contrast with Maine's approach), *see* Carey, *A Positive Perspective*, 15 Trial 31 (January, 1979); and Thorpe, *Juvenile Justice Reform*, 15 Trial 26 (January, 1979).

Maine Juvenile Code provides an adequate substitute for money bail.[11]

 In the criminal context the right to release before trial is conditioned upon the accused's giving adequate assurance that he will be present for trial and submit to sentence if found guilty. *Stack v. Boyle,* 342 U.S. 1, 4–5, 72 S.Ct. 1, 3, 96 L.Ed. 3, 6 (1951). In the juvenile setting, however, a responsible person to take custody of the child is far more significant in providing such assurance than the juvenile's ability to obtain cash for bail. Rarely would the cash be his own funds or advanced to him upon his own credit. Furthermore, the State in its role as *parens patriae* is fully justified in looking to factors other than assurance of later appearance. *See* 15 M.R.S.A. § 3203(4)(C). The welfare of the child is always a valid concern of the State. *See* Paulsen, *Fairness to the Juvenile Offender,* 41 *Minn.L.Rev.* 547, 552 (1957); *Commonwealth ex rel. Sprowal v. Hendrick,* 438 Pa. 435, 265 A.2d 348 (1970).

 We conclude that upon the record before us the Juvenile Court did not abuse its discretion in refusing to release this juvenile on money bail.

### IV

 Next, in connection with the detention order this juvenile challenges the terms "responsible" and "suitable" as used in 15 M.R.S.A. § 3203(4) (Supp.1978), as being unduly vague descriptions of the persons in whose custody he might be released.

We do not agree.

These terms are clearly related to the purposes for which detention may be ordered and from these the terms draw their meaning. Release may be accorded where there are persons suitable or responsible to

ensure the juvenile's later appearance at a court proceeding, to provide physical care, prevent future harmful acts by the juvenile and protect the juvenile.

Furthermore, the general purposes of the Maine Juvenile Code illuminate the meaning of these terms. *See* 15 M.R.S.A. § 3002 (Supp.1978). *See also Uniform Juvenile Court Act* § 14, 9 U.L.A. 413 (1973); *In re Guardianship of Schmidt,* 71 Wis.2d 317, 237 N.W.2d 919, 923 (1976) (term "suitable" broad enough to include all policy considerations which should be weighed by the court in determining child custody placements, including the best interests of the minor); *Creek v. Stone,* 126 U.S.App.D.C. 329, 334, 379 F.2d 106, 111 (1967).[12]

The juvenile takes nothing by his challenge to the terms "responsible" and "suitable."

### V

 It is next urged on behalf of this juvenile that he was entitled to a jury trial at the adjudication hearing under the Due Process Clause of the Maine Constitution,[13] because of the great similarity of a juvenile adjudication to an adult criminal trial.

In *Shone v. State,* Me., 237 A.2d 412 (1968) our Court considered a similar challenge under the prior juvenile statutes. We concluded that the benevolent purposes of that statute obviated the need for jury trials in juvenile proceedings. *Id.* at 417. We found the proceeding to be "civil" in character and therefore exempt from the jury requirement of the criminal justice system.

A label of "civil" or "criminal" will not alone control the result. *Id.; McKeiver v. Pennsylvania,* 403 U.S. 528, 541, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), *Breed v. Jones,* 421 U.S. 519, 529, 95 S.Ct. 1779, 1785, 44

---

11. *See R. v. Whitmer in and for Salt Lake County,* 30 Utah 2d 206, 515 P.2d 617 (1973); *Doe v. State,* Alaska, 487 P.2d 47, 51–52 (1971); *Baldwin v. Lewis,* 300 F.Supp. 1220, 1233 (E.D. Wis.1969); *Fulwood v. Stone,* 129 U.S.App. D.C. 314, 318, 394 F.2d 939, 943 (1967); *but see People ex rel. Wayburn v. Schupf,* 39 N.Y.2d 682, 385 N.Y.S.2d 518, 519, 350 N.E.2d 906, 908 (1976).

12. *Cf. Stanley v. Illinois,* 405 U.S. 645, 651–5, 92 S.Ct. 1208, 1212–14, 31 L.Ed.2d 551, 558–60 (1972); *cf. S**** S**** v. State, supra,* at 568; Katz & Teitelbaum, *PINS Jurisdiction, The Vagueness Doctrine, and the Rule of Law,* 53 *Ind.L.J.* 1, 11 (1977).

13. Me.Const. art. I, sect. 6.

L.Ed.2d 346, 355 (1975). Rather, the result must flow from an analysis which weighs the interests of the State and the interests of the juvenile. We regard the holding of *Shone v. State* to be as applicable under the present Juvenile Code as it was under prior statutes.

No decision of the United States Supreme Court has held that the Due Process Clause of the Federal Constitution [14] requires the states to provide jury trials in juvenile cases. Should a state elect to install a juvenile justice system embracing that feature, that "is the State's privilege and not its obligation." *McKeiver v. Pennsylvania,* 403 U.S. 538, 547, 91 S.Ct. 1976, 1987, 29 L.Ed.2d 647 (1971).

In its concern for the due process rights of juveniles, manifested in several decisions by the United States Supreme Court, that Court expressed the intent to:

> "insure that the juvenile court will operate in an atmosphere which is orderly enough to impress the juvenile with the gravity of the situation and the impartiality of the tribunal and at the same time informal enough to permit the benefits of the juvenile system to operate." *In re Terry,* 438 Pa. 339, 347, 265 A.2d 350, 354 (1970).

That Court has taken great care to refrain from remaking the juvenile proceeding into a fully adversary process which would put an end to the laudable prospect of an intimate, informal and protective proceeding. *McKeiver v. Pennsylvania, supra,* at 545, 91 S.Ct. at 1986, 29 L.Ed.2d at 660. That Court further observed that the addition of a jury requirement "would bring with it into that system the traditional delay, the formality, and the clamor of the adversary system and, possibly, the public trial." Id. at 550, 91 S.Ct. at 1988, 29 L.Ed.2d at 663.

The Maine Juvenile Code adheres to the traditional goals of the juvenile justice system. Its function is directed toward rehabilitation and treatment, rather than punishment of the juvenile. We have discussed *above these goals and their implementation* in the Maine Juvenile Code. Although we need not reiterate them here, it is important that the Juvenile Court keep those goals and purposes in mind throughout the adjudication process.

An appearance in a court of law, much as incarceration in jail, may be strange and fearsome; it may shake a young person's basic trust in his family and adults. *See* Maine's Commission to Revise Statutes Relating to Juveniles, *Summary of Preliminary Report* 35 (1976). A judge who is mindful of the goals of the juvenile justice system and solicitous of the juvenile's well-being can do much to allay these fears, and even at that point the judge can begin the rehabilitative process.

The role of the judge in the Juvenile Court remains much different than that of his counterpart in the criminal justice system. *In re Terry, supra.*

The Maine Juvenile Code provides that hearings shall be "held without a jury but in all other respects shall be conducted as if the juvenile were an adult accused of a crime." 15 M.R.S.A. § 3307(1). This provision of the Code does not imply any less commitment to the traditional goals of juvenile justice by the draftsmen of the Maine Juvenile Code. Instead, this provision of the Code represents their effort to abide by the due process requirements of the Maine Constitution and the Federal Constitution, even as they adhered to those traditional goals.

In adopting the standard upon which this § 3307(1) of our Code is based, Maine's Commission to Revise the Statutes Relating to Juveniles concluded:

> "We believe that in adopting this standard, Maine is merely adhering to constitutional standards for juvenile proceedings already articulated by the Supreme Court" [footnote omitted] *Summary of Preliminary Report* 40 (1976).

That conclusion was not unwarranted. Their Report elsewhere demonstrates the rehabilitative goals of the Maine Juvenile Code. The provisions of the Code for the

---

14. U.S.Const. amend XIV.

adjudication hearing continue to reflect those same goals.

In this context we cannot say that the juvenile's interest in obtaining a jury determination outweighs the State's continuing interest in the existence of an independent and unique juvenile justice system. So long as Maine judges remain studiously aware of the unique nature of juvenile proceedings, the advantages to the juvenile of a jury determination are minimal indeed.

To import a jury trial requirement into Maine's juvenile justice system would not greatly strengthen the fact-finding function of the Juvenile Court, but would result in definite attrition of that court's ability to function in the informal and protective manner which has long been a goal of the system.

> Meager as has been the hoped-for advance in the juvenile field, the alternative would be regressive, would lose what has been gained, and would tend once again to place the juvenile squarely in the routine of the criminal process. *McKeiver v. Pennsylvania,* 403 U.S. 528, 547, 91 S.Ct. 1976, 1987, 29 L.Ed.2d 647 (1971).

Moreover, the availability today in our juvenile justice system of distinctive intake procedures provides an additional buffer between the juvenile and the occasionally over-zealous prosecutor. *Id.* at 552, 91 S.Ct. at 1989, 29 L.Ed.2d at 664.

 We conclude, then, that the benefits of non-jury proceedings under the Maine Juvenile Code are substantial, and that, just as the Due Process Clause of the Federal Constitution does not mandate jury trials for juvenile offenders,[15] so the Due Process Clause of the Maine Constitution does not require that a jury sit as fact finders in the adjudication hearing provided under the Maine Juvenile Code.

## VI

 In our criminal justice system an indictment by a grand jury is not required of the states by the Federal Constitution. *Hurtado v. California,* 110 U.S. 516, 538, 4 S.Ct. 111, 28 L.Ed. 232 (1884). By parity of reasoning, we reject this juvenile's next argument, that in our juvenile justice system an indictment by grand jury was constitutionally required before there could be an adjudication hearing in his case.

The delay, formality and complexity this would interject into the juvenile justice system, without appreciably enhancing the fact-finding process, militate against such a requirement.

Jeopardy to the goals of rehabilitation and treatment is a persuasive reason for not requiring a grand jury indictment before an adjudication hearing in the Juvenile Court. *See Doe v. State,* Alaska, 487 P.2d 47, 54–55 (1971) (intake officer's preliminary investigation superior to grand jury indictment and adequate substitute); *Harvin v. United States,* 144 U.S.App.D.C. 199, 445 F.2d 675 (1971).

 We conclude that an indictment by a grand jury is not essential to due process for the youthful offender who may be brought into the Juvenile Court for an adjudication hearing.

## VII

As his final attack this juvenile asserts that the disposition of his case in Juvenile Court violated the Equal Protection Clauses

---

15. *See United States v. Torres,* 500 F.2d 944 (2d Cir. 1974); *United States v. King,* 482 F.2d 454 (6th Cir. 1973); *In re Terry,* 438 Pa. 339, 265 A.2d 350 (1970); *Estes v. Hopp,* 73 Wash.2d 263, 438 P.2d 205 (1968); *People v. Superior Court of Santa Clara County,* 15 Cal.3d 271, 124 Cal.Rptr. 47, 539 P.2d 807 (1975); *In re McCloud,* 110 R.I. 431, 293 A.2d 512 (1972); *In re D.,* 27 N.Y.2d 90, 313 N.Y. S.2d 704, 708, 261 N.E.2d 627, 630 (1970), appeal dismissed, *cert. denied, sub nomine, D. v. Onondaga County,* 403 U.S. 926, 91 S.Ct. 2244, 29 L.Ed.2d 705 (1971); *In re J. T.,* 290 A.2d 821 (D.C.1972), *cert. denied, sub nomine, Turner v. District of Columbia,* 409 U.S. 986, 93 S.Ct. 339, 34 L.Ed.2d 252 (1972); *In re Mitchell P.,* 22 Cal.3d 946, 151 Cal.Rptr. 330, 587 P.2d 1144 (1978); *Matter of Felder,* 93 Misc.2d 369, 402 N.Y.S.2d 528 (1978).

But see Comment, *The Right to a Jury under the Juvenile Justice Act of 1977,* 14 *Gonzaga L.Rev.* 401 (1979).

of the State and Federal Constitutions,[16] as well as the Due Process Clauses thereof, which he had invoked in his earlier attacks. He points out that the indeterminate sentence imposed upon him, amounting to almost four years on its face, may pursuant to § 3317 of the Code be extended until his twenty-first birthday, a period of nearly seven years. Because a maximum sentence of only five years could be imposed upon an adult convicted of the same offense, he contends that the present sentence is unconstitutional.

The State refutes this argument by pointing out that our Court in *State v. Sargent,* Me., 305 A.2d 273, 280 (1973) recognized that "rationally significant differentiations between the penological purposes and functioning of the Men's Correctional Center and the Maine State Prison" validated the imposition of a longer indeterminate sentence to the former institution than to the latter. The State urges *a fortiori* the same rationale is applicable in this juvenile's case.

 We observe that no provision of the Maine Juvenile Code expressly authorizes the incarceration in the Maine State Prison of one who has been adjudicated to have committed a juvenile crime. It would be inconsistent with the beneficent purposes the Legislature set forth in § 3002 of this Code to imply that such incarceration is authorized as one of the dispositional alternatives where not expressly permitted by this Code. Mention in § 3314(1) of this Code of commitment to the Department of Mental Health and Corrections or the Department of Human Services is in the context of placement of the juvenile in a foster home, group care home or halfway house, or for the provision of services to the juvenile in his own home.

 In any event, the question of an error in sentencing is cognizable upon appeal only if that error appears on the face of the record. *See State v. Rich,* Me., 395 A.2d 1123, 1133 (1978); *State v. Sargent,*

*supra,* at 275. The sentence in this case is for four years, but is subject to extension for a period of three years pursuant to the statute cited above. Potentially, this is an indeterminate sentence of seven years; the initial four year period may be reviewed at any time by the Juvenile Court on petition of the superintendent of the Maine Youth Center and may be altered in any respect; therefore, this juvenile's sentence may be extended for three years at any time. The error this juvenile alleges here may be considered for the reason that this possible seven year term is on its face longer than the five year term which might have been imposed upon an adult convicted of a similar offense.

 We conclude, nevertheless, that the rationale of *State v. Sargent, supra,* is applicable to the present case. There we declared that differentiation for sentencing between young adults, aged 18 to 26, and adults above the age of 26 did not violate constitutional proscriptions of arbitrary classifications. Just as in *Sargent,* the goals of rehabilitation and treatment, now in large degree eschewed by the sentencing provisions of the Maine Criminal Code, justify longer indeterminate sentences for juveniles whose cases are disposed of under the Maine Juvenile Code. The rehabilitation and correctional features of a commitment to the Maine Youth Center yield a rational differentiation between that Center and the Maine State Prison for the purpose of sentencing alternatives, just as did those features of the Men's Correctional Center in contrast to those of the Maine State Prison which were noted in *Sargent,* Me., 305 A.2d 273, 278 (1973).

Indeed, a radical functional difference between institutions such as the Maine Youth Center and the Maine State Prison was recognized in *Shone v. State,* Me., 237 A.2d 412 (1968). This difference in function between the two is entitled to no little weight here.[17]

---

16. *Me.Const.* art. I, sect. 6–A; *U.S.Const.* amend XIV.
17. *See Hilber v. State,* 89 Wis.2d 49, 277 N.W.2d 839 (1979); *Guidry v. United States,*

433 F.2d 968 (5th Cir. 1970); *Caldwell v. United States,* 435 F.2d 1079 (10th Cir. 1970); *In re State of New Jersey in the interest of K. V. N.,* 116 N.J.Super. 580, 283 A.2d 337 (1971); *State*

This juvenile takes nothing by his claim of possible disparity between the disposition of his case and that of an adult offender.

In Law Court Docket No. CUM–78–57 the entry is:

Appeal sustained.

Order of dismissal for mootness vacated.

Remanded to Superior Court for entry of judgment denying appeal.

In Law Court Docket No. CUM–79–10 the entry is:

Appeal denied.

Judgment affirmed.

v. Pitt, 28 Conn.Sup. 137, 253 A.2d 671 (1969); Kotz v. United States, 353 F.2d 312 (8th Cir. 1965); Carter v. United States, 113 U.S.App. D.C. 123, 306 F.2d 283 (1962).