STATE OF MAINE
Knox. S.S., Clerks Office
SUPERIOR COURT

AUG 1 2002

RECEIVED AND FILED
Susan Guillette, Clerk

STATE OF MAINE
KNOX, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-01-001

STATE OF MAINE,

Appellee

v.

WESLEY ROMAN,

Appellant

DECISION AND ORDER

DONALD L. GARBRECHT
LAW LIBRARY

AUG 5 2002

## I. Introduction.

This matter is before the court on the appeal of Wesley Roman (Roman) who seeks reversal of the judgment of conviction for the offense of Assault, 17-A M.R.S.A. § 207(1), entered in the District Court, District Six, Rockland, on December 23, 1999 (Westcott, J.).[1] For the reasons stated herein, the appeal is to be granted.

The appellant cites three bases in support of this appeal. First, and most importantly, he claims he was denied the right to counsel at trial. Second, he challenges the trial court's ruling which, he claims, admitted hearsay evidence. Last, he asserts that the evidence was insufficient to support this conviction.

## II. Facts and Procedural History.

In explanation of the result reached here, it is important to recite the factual and procedural history of this case. In recounting the evidence, the court must do so in the light most favorable to the State. *State v. Brown*, 2000 ME 25, ¶ 7, 757 A.2d 768, 770-71.

At trial, the State produced the testimony of Michael Doucette, a Thomaston police officer, who was called at 2:53 a.m. on October 13, 1999, to respond to a "possible

---

[1] The appellant was sentenced to eight months of incarceration. He was also charged with Violation of Condition of Release, 15 M.R.S.A. § 1092, and found guilty of that offense. He was sentenced to two days of incarceration, concurrent with the eight months, on this charge. He has not appealed that conviction.

domestic." T., p. 14. As a result, he called Jennifer Fetteroli, the complainant, on his cell phone. According to Doucette's testimony, Fetteroli seemed "distraught and kind of scared and somewhat excited, hysterical." *Id.* She told Doucette that her boyfriend, Wesley Roman, "had smashed out the window in her vehicle and had - had hit her and caused other damage to the apartment." *Id.*

Ten minutes later, Doucette met Fetteroli and described her as "kind of flush, red face, puffy, . . . very angry, . . . upset, . . . a little more relaxed now that she knew that a police officer was there." T., p. 16. Doucette took another oral statement from Fetteroli and examined her damaged apartment and automobile. During this interview, the officer asked Ms. Fetteroli if she had suffered any injuries and she responded by showing him a bruise on her bicep. She also told him that earlier in the day an "altercation/argument had taken place" while Fetteroli and Roman were driving to her parents' home during which he spat on her and punched here in the head. T., p. 22. They separated, and later Roman kicked his way into Fetteroli's apartment, "grabbed her and [threw] her on the floor." *Id.* She made it outside and ran to her vehicle where the defendant smashed her car window. Fetteroli agreed to provide a written statement which she turned into Doucette the next day. She also gave him a copy of a temporary order for protection from abuse which she apparently obtained before this second meeting with Officer Doucette.

At trial, Jennifer Fetteroli testified that she had struck Roman in the head while in her car en route to her birthday party at her parents' home. She denied being assaulted later on at their apartment or at any time on October 13. She did acknowledge, however, that she had given the police a written statement and applied for a temporary order for protection from abuse the next day. In these documents, marked exhibits 3

2

and 2, respectively, Fetteroli alleges assaults committed against her by Roman. More specifically in exhibit 2, the complaint for protection from abuse, she described the punch to her head but not being thrown on the floor. In exhibit 3, the written statement given to Officer Doucette, she cites the spitting, being struck in the head, and being pushed on the floor. Both documents were admitted in evidence without objection. T., p. 36.

Fetteroli also testified that she did not remember what she told the police when she called on the night at issue and that she had "said all this stuff because I was mad at him . . . . So, he didn't hit me. I - I guess I did make it all up, but I was the one that him . . ." T., p. 34.

No other witnesses testified at trial concerning the assault, and the court found the defendant guilty of that offense, relying on Fetteroli's telephone conversation with the police officer as an exception to the hearsay rule because it was made soon after the event and Ms. Fetteroli was still in an excited state at that point. The trial judge chose, therefore, to believe what Ms. Fetteroli said on the phone, not her testimony on the witness stand as the most reliable account of what occurred on October 13, 1999.

The procedural history in this case began on October 15, 1999, with the issuance of an arrest warrant for Roman for the offense of assault at Officer Doucette's request. on October 15, 1999. The warrant was executed on November 8, 1999, and Roman was released on $100 cash bail the same day with condition that he have no contact direct or indirect with Jennifer Fetteroli.[2] He was ordered as a condition of bail to report to court on November 30, 1999, when his arraignment was scheduled.

---

[2] He was arrested on November 25, 1999, by Officer Melanie Skidgel for Violation of Condition of Release when she stopped Jennifer Fetteroli for speeding and found the defendant as a passenger in Fetteroli's vehicle.

Notwithstanding the setting of the arraignment date for November 30, this proceeding, according to the docket entries, was conducted on November 29, 1999.[3] Using this same date, Roman filled out the motion for appointment of counsel which was date-stamped "Filed" by the District Court on November 30, 1999. Attached to that form was a second form directing anyone requesting court-appointed counsel to meet with the financial screening officer at 11:00 a.m. on 11/30/99.

Whichever dated the arraignment actually occurred, the defendant pled not guilty and asked for counsel to be appointed for him. Trial date was set for December 23, 1999. Apparently, on November 30, 1999, the defendant met with the financial screening officer as directed, was told to complete a diligent job search in order to qualify for court-appointed counsel, and to fill out a form to verify this effort. Presumably this is done for the salutary purpose of finding a job opportunity for the accused so that he could either pay for his own attorney or reduce the cost to the State in providing counsel through some reimbursement of this expense. The "Verification of Diligent Job Search" form, although it has a space for setting a deadline for its return to the financial screening officer, had no date for that purpose on the form given to Roman. He returned the form to the court on December 8, 1999, listing six potential employers he had contacted. In the meantime, however, on December 1, 1999, the District Court endorsed Roman's Motion for Appointment of Counsel with the words, "[Defendant] has failed to comply w/diligent job search," and, apparently, denied the appointment of counsel.[4]

---

[3] The judge's notes on the reverse of the complaint corroborate November 29, 1999, as the arraignment date.

[4] The clerk's docket entries can be read to understand that notice of the court's denial of court-appointed counsel was mailed to the parties on December 15, 1999.

On December 23, 1999, the trial was conducted with the defendant unrepresented. As noted, he was found guilty of both charges pending against him.[5] He was given a stay of execution on his sentence and filed a notice of appeal on January 14, 2000. The appellant completed his sentence without being released on bail pending appeal.

## III. Discussion.

### A. Right to Counsel.

At the outset, it can be observed that the appellant was apparently eligible for court-appointed counsel when he applied on November 29 or 30.[6] He had no financial assets, no income and only expressed hope for work or a tax refund. Indeed, the judge below did not find that he was not indigent, but refused appointment of counsel on the defendant's failure to comply with a diligent job search. The defendant cites this action as a basis on which his conviction ought to be set aside because its effect was to require him to go to trial without the assistance of an attorney.

M.R. Crim. P. 44(a) provides that a court is to assign counsel to a defendant in a criminal case unless he elects to proceed without counsel, has sufficient means to retain counsel, or has concluded that a jail sentence will not be imposed. While it is the defendant's burden to establish financial inability to obtain counsel, *State v. Smith*, 677 A.2d 1058, 1060 (Me. 1996), it is the court's obligation to determine if he has sufficient

---

[5] The docket entries, the reverse of the complaint, and the judgment and commitment erroneously show that there was no trial and that the defendant pled guilty. The trial transcript shows that there was a trial and that the defendant was found guilty. The court believes that the latter is the more accurate account of what happened in this case.

[6] The back of the complaint shows that no determination was made as to the defendant's indigency on November 29, 1999, but lists his attorney as W. Pagnano. The court assumes that Mr. Pagnano may have been "attorney for the day" on the 29th and stood with the defendant when he entered his plea and bail was set, but that his role was limited to these functions.

means to employ counsel, M.R. Crim. P. 44(b). It is to do so no later than the time of the initial appearance, M.R. Crim. P. 5(e), after advising the defendant of his right to request the assignment of counsel. M.R. Crim. P. 5(b)(2).

Here, it appears that the defendant timely provided the court with prima facie evidence of indigency on forms the judiciary has provided for that purpose. Notwithstanding his demonstration of indigency, however, the decision as to eligibility for appointment of counsel was deferred to an unspecified date after the initial appearance until, apparently, a satisfactory job search was completed. Although M.R. Crim. P. 5(e) requires otherwise, presumably the decision to appoint counsel would be made before trial. As noted, however, the trial judge denied appointment of counsel the day after it was applied for. This was done without any apparent consideration or finding as to the defendant's indigency as M.R. Crim. P. 44(b) requires. Instead, the decision to deny appointment was based on the finding that the defendant failed to comply with a diligent job search within one day of being asked to perform this task.

Assuming that a diligent job search is a legitimate pre-condition for appointment of counsel, it appears to this court to be facially unreasonable to require that it be accomplished 24 hours after the condition is imposed. This is particularly true where, as here, the defendant was apparently given no deadline for the completion of this task, but did return the form on December 8, a date well in advance of trial before which counsel could have been appointed. From all this, it can only be concluded that the trial judge denied appointment of counsel not for the reasons authorized by M.R. Crim. P. 44(a) but, instead, because the defendant did not comply with an arbitrary and unreasonable deadline, for which he had no notice, to verify a job search. In this court's view, the denial of appointment of counsel under these circumstances is not only

contrary to the rules cited herein, which are designed to govern such decisions, but also exceeds the bounds of the trial court's discretion.[7]

Most importantly, the decision to deny appointment of counsel to this defendant resulted in his being required to represent himself at trial contrary to his constitutional right to be assisted by an attorney at such a proceeding. Me. Const. art. I, § 6; *Newell v. State*, 277 A.2d 731, 738 (Me. 1971). A review of the trial transcript demonstrates that the denial of this constitutional right disarmed the defendant in his contest of the assault charge. He made no opening statement, cross-examined neither of the police witnesses, asked only a few questions of the alleged victim, did not testify himself, challenged none of the State's exhibits, and made no final argument. Indeed, throughout the trial the defendant expressed uncertainty as to how to defend himself. T., pp. 4, 33-35, 38. In the end, as noted, he was convicted and sentenced to eight months of incarceration. From this history, it is plain that the trial court's refusal to appoint counsel constituted a deprivation of the appellant's constitutional right to counsel which prejudiced his right to a fair trial, all of which amounts to reversible error.

### B.     Erroneous Evidentiary Ruling.

Although the foregoing discussion serves as an adequate basis for this case to be remanded for a new trial, it is worth addressing briefly the appellant's contention that the trial court erred in its consideration of Ms. Fetteroli's first oral statement to Officer Doucette as admissible evidence. As noted, the trial court apparently admitted this

---

[7] This court appreciates that the decision of December 1 to deny appointment of counsel was undoubtedly made in the press of business which accompanies the criminal docket in a busy District Court.

7

statement as an exception to the hearsay rule as an excited utterance. M.R. Evid. 803(2). T., pp. 37-38.

> A court may admit a hearsay statement as an "excited utterance" if the court finds "(1) that a startling event occurred; (2) that the hearsay statement related to the startling event; and (3) that the hearsay statement was made while the declarant was under the stress of excitement caused by that event."

*State v. Robinson*, 2001 ME 83, ¶ 9, 773 A.2d 445, 448. A critical question in determining whether a statement qualifies as an excited utterance is "how long the state of excitement may be found to last." *Id.*, ¶ 11 (quoting Advisor's Note to M.R. Evid. 803(2)). In resolving this question, the trial court, among other factors, should look to "the amount of time that passed between the startling event and the statement, [and] the declarant's opportunity or capacity for reflection or fabrication during that time, . . ." *Id.*, ¶ 12.

The court in admitting Ms. Fetteroli"s statement on the phone to Officer Doucette did address the "crucial question" of the passage of time between the alleged event in question and her statement to him. *Id.*, ¶ 11. The trial judge could not have done so on the evidence presented, however, because there was no testimony as to the time at which the defendant assaulted Ms. Fetteroli or as to the amount of time which passed between the alleged assault and her brief conversation with Officer Doucette. Indeed, the most the record would show is that she called a dispatcher from her parents' home sometime after the second alleged assault of the evening had occurred at her apartment. This, in turn, was followed by Doucette's call to Ms. Fetteroli during which she made the statement at issue accusing Roman of assault. Whether these events occurred within minutes of each other or hours had to have been resolved before the trial judge could have determined if Ms. Fetteroli's statement satisfied the

8

elements for its admissibility pursuant to the "excited utterance" exception to the hearsay rule.

Because the record provides no support for a finding that the statement at issue closely followed in time the startling or stressful event it addressed, the finding that it did so was clearly erroneous as was its admission in evidence, especially where, as here, it served as an expressed basis to find the defendant guilty of assault. *Id.*, ¶ 10; T., p. 37. Because this, too, amounts to reversible error, it is unnecessary to address the remaining, but less consequential, evidentiary errors claimed by the appellant in his brief.

## C.    Sufficiency of the Evidence.

As noted, *supra*, when examining the sufficiency of the evidence as part of the appellate review of a criminal judgment, the evidence must be examined in the light most favorable to the State to determine whether a factfinder could rationally find guilt beyond a reasonable doubt. *State v. Brown*, 2000 ME 25, ¶ 7, 757 A.2d 768, 771.

Here, even though this court has determined that it was error to admit into evidence Ms. Fetteroli's telephone statement to Officer Doucette, there was independent, admissible evidence that the defendant had assaulted her which would suffice to sustain his conviction if the other errors cited did not compel a different result.

This admissible evidence is State's exhibit 2 which contains Ms. Fetteroli's statement under oath that Wesley Roman had punched her in the head. Such a statement, because it is under oath and inconsistent with her trial testimony, is admissible substantively to establish that the defendant assaulted Ms. Fetteroli. M.R. Evid. 801(d)(1)(A); *State v. Creamer*, 379 A.2d 733, 734 (Me. 1977).

So, even though the trial judge did not specifically cite this evidence as a basis for his finding that the appellant had committed assault, the statement was properly admitted in evidence and provides a sufficient basis on which to establish guilt. That being so, the court can conclude that the record does contain evidence on which a rational factfinder could find proof of guilt beyond a reasonable doubt. *State v. Brown*, 2000 ME 25, ¶ 7, 757 A.2d at 771. That being so, this argument will not serve as a basis to overturn this conviction.

### D.    Mootness.

Although raised by neither party, it is obvious that this appeal may be moot because the appellant has served the sentence imposed and, arguendo, there is no relief that can be now afforded to him as a result of this successful appeal. The Law Court, however, has recognized three exceptions to mootness that are applicable where a defendant has already been released from custody: (1) where collateral consequences will result; (2) where questions of great public interest may be addressed; and (3) where the issues are capable of repetition yet escape appellate review. *Lewis v. Maine*, 2000 ME 44, ¶ 4, 747 A.2d 1191, 1192 (*citing State v. Gleason*, 404 A.2d 573, 578 (Me. 1979)). When a defendant is challenging a conviction, there is a presumption that collateral consequences exist. *State v. Jordan*, 1998 ME 174, ¶ 12, 716 A.2d 1004, 1007 (*citing Sibron v. New York*, 392 U.S. 40, 55-57 (1968); *Bennett v. State*, 289 A.2d 28, 31 (Me. 1972)).

Here, although the record indicates that this was the defendant's fourth assault conviction, the collateral consequences of an assault conviction include possible aggravation of any future assault convictions under 17-A M.R.S.A. § 1252(4-A) and, because this is a domestic assault, the defendant may face federal restrictions on firearm possession pursuant to 18 U.S.C. § 922(d)(8-9) (2002). A defendant who serves his

sentence involuntarily has an interest in avoiding the collateral consequences of a conviction. *State v. York*, 1999 ME 100, ¶ 6, 732 A.2d 859, 861. Accordingly, the defendant's appeal falls within the collateral consequences exception to the mootness rule and he is entitled to appeal his conviction and have it set aside where, as here, reversible error is found.

## IV. Conclusion.

For the reasons stated herein, the clerk will make the following entry:

Appeal SUSTAINED, judgment is VACATED, and the case REMANDED to the District Court for new trial.

So ordered.

Dated: July 31, 2002

John R. Atwood,
Justice, Superior Court

STATE'S ATTORNEY:
Donald Lawson-Stopps, Esq.
Assistant District Attorney
Knox County Courthouse
62 Union Street
Rockland, ME 04841

DEFENDANT'S ATTORNEY:
William Pagnano, Esq.
431 Main Street
Rockland, ME 04841