**Bettina DOBBS et al.**

v.

**MAINE SCHOOL ADMINISTRATIVE DISTRICT NO. 50.**

Supreme Judicial Court of Maine.

Argued Sept. 2, 1980.

Decided Sept. 25, 1980.

Murray, Plumb & Murray, E. Stephen Murray (orally), Ellyn C. Ballou, Portland, for plaintiffs.

Drummond, Woodsum, Plimpton & MacMahon, Richard A. Spencer (orally), Portland, for defendant.

Before McKUSICK, C. J., and WERNICK, GODFREY, NICHOLS, GLASSMAN and ROBERTS, JJ.

McKUSICK, Chief Justice.

Plaintiffs in this action are twelve voter–taxpayers of School Administrative District No. 50 (S.A.D. 50), which consists of the towns of Thomaston, St. George, and Cushing. Plaintiffs seek a declaratory judgment that a June 19, 1979, district vote approving a bond issue for school construction was void, and request an injunction against any action based on that vote. The Superior Court ordered summary judgment for defendant S.A.D. 50, and plaintiffs appeal.[1] We deny the appeal.

On April 24, 1979, three propositions that would have authorized certain school construction in S.A.D. 50, and the issuance of bonds to finance the same, were defeated by vote of the residents of the district.[2] Subsequently, S.A.D. 50's Board of Directors was presented with petitions signed by 903 citizens of the district in support of the proposed construction. The petitions, however, failed to comply with the requirements of 20 M.R.S.A. § 225(2)(I)[3] (Supp. 1980) in that they were neither submitted within 7 days after the April 24 vote nor accompanied by a tender of costs. On May 17, the Board of Directors voted, 9–to–1, to resubmit the school construction questions to the voters. At the subsequent referendum vote, held on June 19, 1979, the three propositions passed.[4] Plaintiffs then brought this action to enjoin S.A.D. 50 from issuing any bonds or taking any other action in reliance upon the results of the second referendum. At a pretrial conference, the parties stipulated that judgment could be entered for S.A.D. 50 if its Board of Directors as a matter of law possessed independent discretionary authority to resubmit previously defeated questions to the voters and if the Board did in fact exercise that independent authority rather than act under the compulsion of the petitions. The Superior Court justice found for defendant S.A.D. 50 on both the legal and the factual

---

1. This court has heard plaintiffs' appeal on an expedited basis following defendant's motion therefor, filed on June 3, 1980.

2. On the $2,618,100 bond issue to finance the construction of a new middle school in Thomaston and an addition to the St. George Elementary School, the vote was 432 yes and 492 no.

3. 20 M.R.S.A. § 225(2)(I) provides in pertinent part:

I. When requested by 10% of the number of voters voting for the gubernatorial candidates at the last statewide election in the municipalities comprising the district within 7 days of any prior district meeting, the directors shall call a district meeting to be held within 30 days of the presentation of the petition to reconsider any prior district meeting vote under this section. . . . If the margin of the vote being reconsidered was not less than 10% nor more than 25%, the petitioners shall tender with that petition an amount equal to the actual, reasonable costs of that vote to reconsider. If the vote being reconsidered exceeded 25%, the petitioners shall tender with that petition a bond equal to the actual, reasonable costs which may be incurred as a result of the delay of any authorization or approval granted at the prior district meeting under this section, and further, shall tender with that petition an amount equal to the actual, reasonable costs of that vote to reconsider. If the petitioners are successful, the bond shall be cancelled.

4. Except in minor details, the resubmitted questions were identical to the original questions; the second vote on the bond issue was 719 yes and 680 no.

questions thus posed. We affirm his decision.

## I.

■ The first issue presented to us is whether S.A.D. 50's directors had the independent authority to resubmit the school construction questions to the voters at the June 19, 1979, election. Our examination of the relevant statutes and their legislative histories satisfies us that the legislature that first created Maine's school administrative district system expressly empowered S.A.D. directors in their discretion to put a referendum question to a second vote, and that no subsequent legislature has altered that grant of power.

In 1957, the Ninety–eighth Legislature enacted the comprehensive School Administrative District Act,[5] which is now 20 M.R.S.A. ch. 9. That statute granted the directors of a school administrative district extensive powers in financing, constructing, and operating the schools under their jurisdiction. As pertinent here, the legislature declared:

> To procure funds for capital outlay purposes . . . the school directors of said district are authorized to issue bonds and notes of the district . . .. The issuing of bonds or notes for capital outlay purposes shall first be approved by a majority of those qualified voters of the district voting at an election *called by the school directors* and held as provided in section 111–T . . ..

(Emphasis added) R.S. 1954, ch. 41, § 111–K. That portion of section 111–K that is quoted here survives, without any change of substance, as the present 20 M.R.S.A. § 304.[6]

The introductory paragraph of the referred–to section 111–T expressly authorized S.A.D. directors to call district meetings. The relevant portions of that section 111–T provided:

> When it is necessary to hold a district meeting to approve the issuance of bonds or notes for capital outlay purposes, . . . the school directors shall be authorized to call such meeting as follows:
>
> I. Each district meeting shall be called by a warrant. . . .
>
> II. The warrant for calling the district meeting shall be as follows:
>
> .　　.　　.　　.　　.
>
> III. Form of said articles:
>
> .　　.　　.　　.　　.

The first paragraph of section 111–T has survived, without any change that is here relevant, as the first paragraph of 20 M.R.S.A. § 225.

The legislative grants of authority in the portions of sections 111–K and 111–T that have been quoted above were in terms unlimited. Section 111–K put no restraints whatever on the power of S.A.D. directors to submit to the district voters referendum questions, including those that had previously been voted down. On the contrary, the first paragraph of section 111–T affirmatively provided that the directors might in

---

**5.** R.S. 1954, ch. 41, §§ 111–A *et seq.* (Cum. Supp.1963). During the 1957 regular session, the legislature enacted P.L. 1957, ch. 364, "An Act Relating to Educational Aid and Reorganization of School Administrative Units," for the avowed purposes of equalizing the educational opportunities of children in the state and of maximizing the benefits derived from public expenditures on education. P.L. 1957, ch. 364, § 1–B; R.S. 1954, ch. 41, § 111–A. During the second special session, the same legislature enacted P.L. 1957, ch. 443, "An Act Relating to Educational Aid and to Clarify the Procedure of the Reorganization of School Administrative Units." Chapter 443 added certain sections to the earlier enactment, including the predecessor of 20 M.R.S.A. § 225, the statute with

which we are primarily concerned in the present case.

**6.** The precise differences between the quoted portion of R.S. 1954, ch. 41, § 111–K, and the parallel portion of its successor statute, 20 M.R.S.A. § 304, are that:

(a) the material represented by the second ellipsis in the quote from section 111–K above, which limited the total permissible indebtedness of a school administrative district at any one time, has been transferred to a subsequent paragraph in current section 304; and

(b) the reference in section 111–K to section 111–T has been replaced in section 304 by a reference to section 111–T's present counterpart, section 225.

their discretion call a district meeting to approve the issue of bonds "[w]hen it is necessary." By its terms, then, section 111–T provided for a school district's directors to call however many meetings were necessary, in their judgment, to bring bond issue questions before the voters. In summary, the 1957–58 Legislature plainly granted the directors of an S.A.D. broad powers to determine when and how many times a bond question should be submitted to the district's voters. The precise language of those provisions has been carried forward in the present School Administrative District Act.

Plaintiffs contend, however, that the broad power to call district meetings granted to S.A.D. directors by the introductory paragraph of what is now section 225 is limited by subsequent provisions of that section. Plaintiffs argue that the concluding phrase of the introductory paragraph of that section, namely, the phrase "as follows," introduces a set of restrictions on the directors' powers, rather than merely a description of the manner in which those powers are to be exercised. A further examination of the original R.S. 1954, ch. 41, § 111–T, refutes any such construction; the balance of the section as originally enacted clearly served only the function of spelling out the procedure to be followed by the directors in calling district meetings. That section 111–T(II) set out eight requirements for the warrant to call a district meeting. The requirements were that a meeting be called within 45 days of the date of the warrant; that the articles to be voted on at that meeting be set out in the warrant; that the warrant be directed to any resident of the S.A.D. directing him to notify town officers of the requirement that they call a town meeting; that the warrant be served upon each town clerk in the district; that return of service be made; that the town clerk notify the municipal officers and that they in turn call a town meeting; that the voting at the meeting be done according to certain statutory provisions; and that the

voting in cities be conducted in a specified manner. These requirements involved the mechanics for calling a district meeting and neither added to nor took away from the grant of power in the section's introductory paragraph authorizing the directors to decide when to set those mechanics in motion. In short, the plain language of the original section 111–T reveals a legislative intent to do no more than establish the procedure by which district meetings might be called when the directors saw fit to call them in accordance with the broad grant of authority contained in the introductory paragraph.

Sections 111–K and 111–T as originally enacted not only expressly authorized S.A.D. directors in their discretion to call a district meeting to consider or reconsider bond questions, but also provided no other method of bringing such questions to a vote. That statutory scheme was in sharp contrast to the then–existing provision in municipal law, which in one form or another had been on our statute books since 1821,[7] allowing 10% but in any event no less than ten of a municipality's voters to petition a local justice of the peace to call a town meeting following an unreasonable refusal of the town's selectmen to do so. In 1973, the legislature, aware of that discrepancy, determined to give a minority of a school district's voters rights similar to those enjoyed by a municipal minority. *See* 1973 Leg. Rec. 4861. Accordingly, that legislature added what is now the last sentence of section 225(2)(A), which provides:

> When requested by 10% of the number of voters voting for the gubernatorial candidates at the last statewide election in the municipalities comprising the district, the directors shall call a district meeting, placing before the voters the specific school construction article which has been requested by the petitioners.

This court was called upon to construe the new last sentence of section 225(2)(A) in *Heald v. School Administrative Dist. No. 74,*

---

7. 1821 Laws, ch. 114, § 5 (1822 ed.). *See* R.S. 1841, ch. 5, § 3. The 10%–of–the–voters provision was added by P.L. 1933, ch. 198. The current law appears at 30 M.R.S.A. § 2051(4) (1978).

Me., 387 A.2d 1 (1978). The only issue in *Heald* was whether under that statutory provision 10% of an S.A.D.'s voters could compel the calling of a reconsideration meeting against the directors' wishes. We held that the new language in section 225(2)(A) did not empower them to do so. We did, however, recognize in dictum the power of the district directors to call a district meeting, even for reconsideration of a bond issue question. *Id.* at 4. There is nothing in section 225(2)(A) or its legislative history that suggests that in 1973 the legislature, by giving voters the power to force the calling of a district meeting, intended to limit in any way the directors' existing authority to do so whenever in their judgment the meeting was "necessary." [8]

After the Superior Court decision in *Heald*, but before this court's opinion affirming that decision, the legislature in 1977 enacted section 225(2)(I), the focus of the present controversy.[9] Plaintiffs assert that, even if S.A.D. directors previously enjoyed an unlimited discretionary authority to call district meetings for the reconsideration of bond questions, the 1977 addition of subsection 2(I) to section 225 divested them of that power. Plaintiffs argue that subsection 2(I) raises by negative implication a legislative prohibition against an S.A.D. board's resubmitting a previously defeated referendum question otherwise than where compelled to do so by a petition signed by at least 10% of the district's voters, filed within 7 days of the contested election and accompanied by the required bond and tender of costs.

Courts are charged with placing a reasonable construction upon legislative enactments in light of their evident purpose and the context in which they appear. *Town of Arundel v. Swain*, Me., 374 A.2d 317, 319–20 (1977); *Reggep v. Lunder Shoe Products Co.*, Me., 241 A.2d 802, 804–05 (1968). The strained construction by negative implication urged on us by plaintiffs is unnecessary to effectuate fully the obvious purpose of subsection 2(I), namely, to empower a minority group of voters under limited circumstances to force a district vote against the will of the directors. Absent some more explicit indication than appears on the face of section 225(2)(I) and in the limited legislative history,[10] we will not attribute to the legislature the Draconian purpose of circumscribing the directors' discretion in the manner urged by plaintiffs, especially on matters of such public importance as school financing and the other actions requiring voter approval. We find startling plaintiffs' argument that the legislature by a mere negative implication barred an S.A.D.'s voters from reconsidering an issue, if a technically sufficient petition is not filed within 7 days or if in the particular district there is no one willing or able to furnish the tender for costs and possible bond required by subsection 2(I).[11]

The Superior Court correctly rejected any implied limitation upon the express statutory authority of S.A.D. directors to exercise their judgment as to when the district voters should have an opportunity to consider or reconsider any of the major policy mat-

---

**8.** The last sentence of section 225(2)(A) was enacted by P.L. 1973, ch. 571, § 20–A, which was in turn adopted from Senate Amendment A to L.D. 1378. The emergency preamble to L.D. 1378 states that the provisions contained therein are proposed in order to correct certain inconsistencies and technical errors arising from previous legislative enactments. This statement demonstrates, if anything, the intent to be faithful to the intendments of previous legislatures, including the Ninety–eighth Legislature that enacted the original version of section 225.

**9.** 20 M.R.S.A. § 225(2)(I) is quoted in pertinent part in n. 3 above.

The chronology of events referred to in the text was as follows: The Superior Court judg-

ment in *Heald* was entered on March 24, 1976. On March 17, 1977, Representative Burns of Anson introduced L.D. 1105, in the House of Representatives. With certain procedural amendments, that bill was enacted as 20 M.R.S.A. § 225(2)(I) by P.L. 1977, ch. 195.

**10.** The "Statement of Fact" accompanying L.D. 1105 states only that "[t]he purpose of this bill is to reconsider education district meetings."

**11.** It should be noted that the last sentence of subsection 2(A) and the whole of subsection 2(I), both of 20 M.R.S.A. § 225, are the only two provisions that give the power to bring issues before a district meeting to anyone other than the S.A.D.'s directors.

ters committed to popular vote. It must be remembered that all we are concerned with here is the authority of the directors to initiate voter reconsideration of a public issue. As with any other power of the directors, if a majority of the citizens believe the S.A.D. directors have overused their authority to call district meetings, their remedy lies in the ballot box at the time those directors are up for reelection.

## II.

■ The other issue before us is whether the Superior Court erred in concluding that there was no "genuine issue as to any material fact" that would prevent the entry of summary judgment for defendant S.A.D. 50. *See* M.R.Civ.P. 56(c). The Superior Court determined from the minutes of the May 17 meeting (which plaintiffs themselves argue was the only admissible evidence relevant to the fact issue [12]) that S.A.D. 50's Board of Directors did in actuality exercise their independent authority to resubmit the school construction question, and did not act from any sense of legal compulsion because of the ineffective petitions.

On the basis of the minutes we agree with the Superior Court's conclusion that there exists no genuinely disputed issue of fact as to the directors' motivation. Although their comments at the Board's meeting show that some of the members were impressed by the sizeable number of citizens who had signed the reconsideration petitions, it is perfectly clear that the directors realized that the petitions put them under no legal mandate to resubmit the bond question. After the superintendent of schools presented "the petitions signed by 903 certified voters" and reported the opinion of counsel that another vote would be legal, he told the Board:

The matter was in the Board's hands. The Board could call for another vote or not.

The Board opted to call for another vote.

■ In any event, even if there did exist a genuine dispute as to what moved the Board of Directors to call for the second vote, their motivation is not a *material* fact in this litigation. The S.A.D. 50 Board of Directors is a legislative body that a court will not require to account for the reasons it exercised its express power to call a district meeting. The applicable law is summarized by a treatise writer as follows:

[T]he courts will not inquire into the motives of legislators in passing or doing an act, where the legislators possess the power to pass or do the act and where they exercise that power in a mode prescribed or authorized by the organic law. Therefore, *neither the motives of the members of a municipal legislative body nor the influences under which they act can be shown to nullify an ordinance duly passed in legal form, within the scope of their powers.* In such case the doctrine is that the legislators are responsible only to the people who elect them.

(Emphasis added) 5 McQuillin, *Municipal Corporations* § 16.90, at 287 (1970). *See also Skowhegan v. Heselton,* 117 Me. 17, 20, 102 A. 772, 773 (1917). It would not be within the judicial province to nullify the outcome of the reconsideration vote even if the directors had called it upon a mistaken belief as to the legal consequences of the petitions. *See State ex rel. Kittel v. Bigelow,* 138 Ohio St. 497, 502, 37 N.E.2d 41, 44 (1941).

The entry must be:

Appeal denied.

Summary judgment for defendant S.A.D. 50 affirmed.

All concurring.

---

12. We express no opinion whether plaintiffs and the Superior Court were correct in the view that no parol evidence was admissible on the fact question as posed by the parties.