STATE OF MAINE                          SUPERIOR COURT
WALDO, ss.                              DKT. NO. CV-2018-45

ELEANOR DANIELS and DONNA      )
BRODERICK,                     )
                               )
        Plaintiffs,            )
                               )
v.                             )     **ORDER**
                               )
CITY OF BELFAST,               )
                               )
        Defendant,             )
                               )
AND                            )
                               )
NORDIC AQUAFARMS, INC., and    )
BELFAST WATER DISTRICT,        )
                               )
        Parties-in-Interest.   )

In this declaratory judgment action, Plaintiffs Eleanor Daniels and Donna Broderick seek

a judicial declaration setting aside a number of actions taken by the Belfast City Council. Plaintiffs

contend these actions violated state and local law regarding the proposed Nordic Aquafarms, Inc.

("Nordic") salmon aquaculture facility in Belfast. The parties cross-moved for summary judgment

upon a partially stipulated record, and each side made a number of related arguments.

Specifically, Plaintiffs seek a declaration voiding the following actions: (1) the City

Council's April 17, 2018 amendment to the Future Land Use Plan section of the City's

Comprehensive Plan; (2) the City Council's April 17, 2018 adoption of amendments to several

City ordinances—without Planning Board input—that would open the door for the proposed

Nordic facility; (3) the City Council's subsequent October 16, 2018 adoption of the amendments

to the ordinances after Planning Board review; and (4) the City Council's October 16, 2018

findings of consistency between the newly amended ordinances and both the April 17, 2018 Future

Land Use Plan amendments to the Comprehensive Plan and the 2009 Future Land Use Plan as

1

adopted in 2009.[1]

Defendant, for its part, contends the following: (1) the City Council properly amended the Future Land Use Plan section of the Comprehensive Plan on April 17, 2018; (2) the City Council properly adopted amendments to several City ordinances on April 17, 2018; (3) even if the April 17, 2018 adoption of amendments to several City ordinances was not proper, the City Council remedied any error on October 16, 2018, when it adopted amendments to several City ordinances after the Planning Board provided review and revision, thus mooting Plaintiffs' claims of impropriety regarding the original adoption of the ordinance amendments; (4) the City Council properly found the October 16, 2018 amendments to several ordinances to be consistent with the April 17, 2018 Future Land Use Plan amendments to the Comprehensive Plan; and (5) even if the April 17, 2018 Future Land Use Plan amendments did not comply with the law, the City Council nonetheless properly found the October 16, 2018 amendment of several ordinances to be consistent

---

[1] "Future Land Use Plan" and "Comprehensive Plan" have been used interchangeably at points in this case. As the record demonstrates, the Future Land Use Plan is one section of the City's Comprehensive Plan. At times, however, the City has referred to the 2009 Future Land Use Plan as *the* Comprehensive Plan, as well as *part* of the Comprehensive Plan. Whether the 2009 Future Land Use Plan was *the* Comprehensive Plan in 2009 is not material to the Court because, either way, the 2009 Future Land Use Plan was undoubtedly the guidance document for land use policy in Belfast until at least 2012, if not 2018.

The parties dispute whether the Comprehensive Plan was properly amended in 2012. What is not in dispute is that the Future Land Use Plan was amended in 2009, and that 2009 amendment to the Future Land Use Plan was to be incorporated into the subsequent 2012 amendment to the entire Comprehensive Plan. (*See, e.g.*, Joint Stip. ¶ 23; JS Ex. 23, "Introduction to the Future Land Use Plan" Section, 1; Joint Stip. ¶ 24; JS Ex. 24, "Table of Contents, Section 4. Future Land Use Plan" and "Section 2.4. Overview of Future Land Use Plan," 1 ("Section 4 of this [2012] Comprehensive Plan includes the adopted Future Land Use Plan for the City of Belfast. . . . The Council, in late October 2009, chose to adopt the Future Land Use Plan.").)

When the City amended the Comprehensive Plan on April 17, 2018, it did not amend the entire Comprehensive Plan; it amended the Future Land Use Plan section of the Comprehensive Plan. (Joint Stip. ¶ 7(j); JS Ex. 10-007 to JS Ex. 10-038.) When the City Council made its consistency findings on October 16, 2018, it made findings regarding both the 2009 version of the Future Land Use Plan and the April 17, 2018 version of the Future Land Use Plan. (Joint Stip. ¶ 7(r); JS Ex. 15-003 to JS Ex. 15-006.) Thus, the Court does not find it to be material whether the 2012 Comprehensive Plan was ever properly amended. The proposed 2012 Comprehensive Plan was to include the 2009 version of the Future Land Use Plan, with which the City Council made a finding of consistency in relation to the amended ordinances.

with the 2009 Future Land Use Plan.

The Court has reviewed the parties' extensive and thorough briefing, all statements of material fact, and the record exhibits supporting those statements of material fact; it issues the following decisions on the parties' cross-motions for summary judgment.

## LEGAL STANDARD

Summary judgment is granted to a moving party where "there is no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law." M.R. Civ. P. 56(c). "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact-finder to choose between competing versions of the fact." *Lougee Conservancy v. CityMortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774 (quotation marks omitted). When reviewing the record on a motion for summary judgment, a court views the facts in the light most favorable to the non-moving party. *See Cormier v. Genesis Healthcare LLC*, 2015 ME 161, ¶ 7, 129 A.3d 944. "Any doubt on this score will be resolved against the movant, and the opposing party will be given the benefit of any inferences which might reasonably be drawn from the evidence." 3 Harvey, *Maine Civil Practice* § 56:5 at 240 (3d, 2011 ed.). When there are cross-motions, the rules applicable to summary judgment are applied separately to each motion. *F.R. Carroll, Inc. v. TD Bank, N.A.*, 2010 ME 115, ¶ 8, 8 A.3d 646.

## BACKGROUND

This declaratory judgment action presents a unique scenario in which both Plaintiffs and Defendant move for summary judgment on the same issues, oppose the other side's motion on essentially the same bases as asserted in their own motion, and stipulate to a number of facts while setting forth additional facts in support of their respective motions. Additionally, notwithstanding the assertion of facts beyond those stipulated to, each side does not oppose the other side's motion

3

on the basis that there are genuine issues of material fact; instead, each side opposes the other side's motion on the basis that the respective opposing side is entitled to judgment as a matter of law, effectively an implicit reference to Rule 56(c). (Pl.s' Opp. to Def.'s Mot. Summ. J. 17-18; Def.'s Opp. to Pl.s' Mot. Summ. J. 13.) Thus, the Court sets forth the *material* facts that are before it.[2] Those come from the stipulated facts and each summary judgment record, with those facts viewed in the light most favorable to the nonmoving party on each motion.

### 1. The Proposed Nordic Property.

Party-in-interest Nordic proposes to build and operate a $150-$500 million land-based salmon aquafarm (the "Nordic Aquafarm") on three abutting parcels of land located in the City of Belfast, Maine. (Joint Stip. ¶ 1.) These parcels (the "Nordic Parcel") are presently owned by Party-in-interest Belfast Water District ("BWD"), Mathews Brothers Company, and Samuel Cassida. (Joint Stip. ¶ 1.) The BWD owns land that is located in both Belfast and Northport ("BWD Land"). (Joint Stip. ¶ 2.)

In September 2017, Nordic approached the BWD and the City of Belfast to inquire about purchasing land, and thereafter Nordic, the City, and the BWD engaged in discussions and negotiations that resulted in three certain agreements being signed on January 30, 2018. (Joint Stip. ¶ 5.) As a result of negotiations and agreements reached by Nordic, BWD, and the City, the City of Belfast, if the Nordic sale is consummated, will purchase approximately forty acres of the BWD Land, located in both Belfast and Northport abutting the Little River and Little River Reservoir, the shoreland portion of which will be perpetually preserved as public conservation

---

[2] The Court emphasizes "material" because not all facts before it are truly material to the issues of attempted amendment of the Future Land Use Plan section of the Comprehensive Plan on April 17, 2018; attempted amendment of the certain zoning ordinances on both April 17 and October 16, 2018; and the City Council's consistency findings made on October 16, 2018. Some facts are not truly material to these issues but do provide important context for the dispute in this case, and the Court has included those when necessary.

land for passive public recreational use, including a walking trail ("Waterfront Parcel," and also in certain maps as "Resource Protection Shoreland District"). (Joint Stip. ¶ 3.)

As of March 1, 2019, the Nordic Parcel comprises approximately fifty-six acres (the "Amended Nordic Parcel"). (Joint Stip. ¶ 14.) Approximately thirty acres of the land in the Nordic Parcel is currently owned by the BWD. (Joint Stip. ¶ 15.) The original proposal was to acquire forty-two acres—thirty from the BWD, and twelve from abutting property owner Samuel Cassida. (Joint Stip. ¶ 16.) On August 29, 2018, Nordic contracted to purchase another abutting fourteen acres from window and door manufacturer Mathew Brothers Company, resulting in the Amended Nordic Parcel. (Joint Stip. ¶ 16.) The entire Mathew Brothers Company property presently abuts the BWD property, and is located in a zone that allows industrial use. (Joint Stip. ¶ 17.) The Matthews Brothers property has been part of the Business Park "land use area" since adoption of the 2009 Future Land Use Plan.[3] (Def.'s Supp.'g S.M.F. ¶ 19.) With the addition of the Mathew's Brothers Company parcel, the Amended Nordic Parcel will share a common boundary with the Plaintiffs' residence on Perkins Road. (Joint Stip. ¶ 18.)

2. The City's Process and Procedures to Amend the Future Land Use Plan Section of the Comprehensive Plan and Amend the Relevant Zoning Ordinances.

The City Council was the municipal body which took public comment, held meetings and hearings, and then adopted the amendments to the Zoning, Shoreland Zoning, and Definitions ordinances, as well as the Future Land Use Plan section of the Comprehensive Plan, on April 17, 2018; all related notices were prepared and published by the Planning and Code Department. (Joint Stip. ¶ 6.) The following represents a timeline of duly noticed meetings and public hearings related

---

[3] Under the applicable zoning ordinance, the Mathews Brothers property is still designated as a one-parcel Industrial IV Zone. (Pl.s' Opp. S.M.F. ¶ 19.) The Mathews Brothers industrial use preexisted the creation of the Comprehensive Plan and thus its designation is not a product of the Future Land Use planning. (Pl.s' Opp. S.M.F. ¶ 19.)

to public involvement and participation in the City's review and approval of amendments to the Future Land Use Plan section of the Comprehensive Plan and its Zoning, Shoreland Zoning, and Definitions ordinances related to the Nordic project:

- September 2017:

  o Nordic contacts BWD about BWD Land as a potential development site (Joint Stip. ¶ 7(a).);

- October 2017 through January 30, 2018:

  o Non-public discussions involving Nordic's proprietary business plans and real property purchase issues, concerns, and negotiations occur by and between Nordic, BWD, and the City (Joint Stip. ¶ 7(b).);

- January 30, 2018:

  o Nordic, BWD, and the City enter into the Options to Purchase Agreement, the Evaluations Agreement, and the Water Supply Agreement (Joint Stip. ¶ 7(c).);

  o The City holds the public announcement and presentation of Nordic plans to seek to develop the BWD property in Belfast at the University of Maine Hutchison Center, as attended by then-Governor LePage, state and local elected officials, and with a public question and answer session (Joint Stip. ¶ 7(d).);

- February and March 2018:

  o The Nordic project requires several zoning ordinance amendments, which Planning Director Wayne Marshall prepares at the direction of the City Council and initially presents to the City Council on March 2, 2018 (Def.'s Supp.'g S.M.F. ¶ 32.);

  o The Planning Department works to draft the related proposed amendments to the Future Land Use Plan section of the Comprehensive Plan, in addition to the Zoning,

6

Shoreland Zoning, and Definitions ordinances regarding the Nordic proposal (Joint Stip. ¶ 7(e).);

- March 6, 2018:

  o The City Council introduces related Comprehensive Plan and ordinance amendments as an agenda item at a City Council meeting (Joint Stip. ¶ 7(f).);

  o At a duly noticed City Council meeting, the Planning Director introduces the Zoning, Shoreland Zoning, and Definitions ordinance amendments, as well as the amendments to the Future Land Use Plan section of the Comprehensive Plan, as drafted by the Planning Department with a proposed schedule for reviewing and approving them (Joint Stip. ¶ 7(g).);

  o The City Council waives the City's statutory right of first refusal to acquire the land being purchased by Nordic from the BWD, excepting the conservation land the City contracted to purchase from BWD under the terms of the agreements executed on January 30, 2018 (Joint Stip. ¶ 7(h).);

- March 20, 2018:

  o The City Council conducts its first reading, holds a public hearing, and receives public comment on the proposed amendments (Joint Stip. ¶ 7(i).);

- April 17, 2018:

  o At a duly noticed City Council meeting, the City Council holds the second formal reading under the City Charter and the second public hearing on the draft Zoning, Shoreland Zoning, and Definitions ordinance amendments, and the Future Land Use Plan section of the Comprehensive Plan amendments; the City Council received 146 written comments in advance of the April 17 hearing and hears from

27 members of the community at the hearing (Joint Stip. ¶ 7(j).);

- June 5, 2018:

  o The City Council conducts a hearing to reduce the height limits for buildings located within the Route One South Business Park Zone and to exclude solar panels from the height calculation; said amendments were approved on June 5, 2018 (Joint Stip. ¶ 7(k).);

- August 15, 2018:

  o The Planning Board receives written and verbal comments and closed the public hearing portion of its review, and thereafter conducts deliberations on August 22 and September 5, 2018 (Joint Stip. ¶ 7(*l*).);[4]

- September 12, 2018:

  o The Planning Board concludes its drafting and deliberations and adopts its written recommendations to the City Council on Zoning, Shoreland Zoning, and Definitions ordinance amendments, and the Planning Board drafts additional standards for a permit requirement for any Significant Groundwater Well (the "Planning Board-reviewed-and-revised ordinances") (Joint Stip. ¶ 7(m).);

- September 18, 2018:

  o The Planning Board Chair and Planning Director present to the City Council the Planning Board-reviewed-and-revised ordinances (Joint Stip. ¶ 7(n).);

- September 25, 2018:

  o The City Council conducts the first reading and public hearing of the Planning

---

[4] See Background Section 4 below for more detailed discussion on the circumstances of Planning Board involvement after the April 17, 2018 adoption of the zoning ordinance amendments.

Board-reviewed-and-revised ordinances, as recommended by the Belfast Planning Board; the City Council accepts the recommendation for the said four ordinance amendments, which were later considered at the October 9, 2018 City Council hearing (Joint Stip. ¶ 7(o).);

- October 9, 2018:
  - The City Council conducts a second reading and the second hearing of the Planning Board-reviewed-and-revised ordinances, as recommended by the Belfast Planning Board (Joint Stip. ¶ 7(p).);

- October 16, 2018:
  - The City Council adopts all of the Planning Board-reviewed-and-revised ordinances, as recommended by the Planning Board (Joint Stip. ¶ 7(q).); and,
  - The City Council also adopts motions approving two consistency findings with both the April 17, 2018 and 2009 versions of the Future Land Use Plan section of the Comprehensive Plan (Joint Stip. ¶ 7(r).).

Plaintiffs attended and testified at the April 17, September 25, and October 9 City Council hearings and the August 15 Planning Board hearing. (Joint Stip. ¶ 33.) One of the Plaintiffs, and on some occasions both Plaintiffs, attended all Nordic informational sessions held at University of Maine Hutchison Center in Belfast. (Joint Stip. ¶ 33.)

3. The City's Original Adoption of the Comprehensive Plan, the 2009 Future Land Use Plan, the 2012 Comprehensive Plan, and the April 17, 2018 Amendments.

In 1995, the City Council adopted a Comprehensive Plan, which was amended in 1997. (Joint Stip. ¶ 19.) During the period from 1999 through 2008, the City Council amended the Comprehensive Plan with specific amendments on nine separate dates. (Joint Stip. ¶ 20.) In June of 2001, Belfast residents adopted and updated the City Charter by referendum, effective July 1,

2001, thereby replacing the prior existing Charter. (Joint Stip. ¶ 21.) Article VI, Section 9 of the City Charter established a Comprehensive Planning Committee as a standing committee of seven members with one member from each of five wards and two at-large members serving staggered two-year terms. (Joint Stip. ¶ 22.) The powers and duties of the Planning Committee are as stated in the Charter, including in accordance with 30-A M.R.S. § 4324 (2018), other applicable law, and Council initiatives. (Joint Stip. ¶ 22.) No City Councilor may be appointed to the Planning Committee. (Joint Stip. ¶ 22.)

In October of 2009, the City Council adopted the Future Land Use Plan as an amendment to the 1997 Comprehensive Plan, with the intent to fully replace the 1997 plan; the 1997 Plan has not served to guide City Planning in any way since the adoption of the 2009 Future Land Use Plan.[5] (Joint Stip. ¶ 23.) The 2009 Future Land Use Plan was recommended by the Planning

---

[5] The Court notes that exhibit supporting Joint Stip. ¶ 23 states in the "Introduction to the Future Land Use Plan" the following:

> The Future Land Use Plan *replaces Chapter 12*, Goals, Policies and Implementation Strategies, Section G. Orderly Growth and Development, *of the Comprehensive Plan* that was initially adopted by the Council in 1995, and all subsequent amendments to Section G. that the Council adopted between 1997 and 2008. Ultimately, this Future Land Use Plan *will be incorporated into the new Comprehensive Plan* which the City Comprehensive Planning Committee is now working to complete. . . . The Plan presented in this document is the adopted Future Land Use Plan for the City of Belfast. This Plan is *part of the City Comprehensive Plan*, and this Future Land Use Plan *replaces the previously adopted Future Land Use Plan of 1995 and 1997*, as such had been amended between 1998 and 2008.

(Joint Stip. ¶ 23; JS Ex. 23, "Introduction to the Future Land Use Plan" Section, 1, 3 (emphases added).) This quoted language of the adopted 2009 Future Land Use Plan does not support the proposition that the 2009 Future Land Use Plan was *intended to fully replace* the entirety of the 1997 Comprehensive Plan. Elsewhere, however, the 2009 Future Land Use Plan does state that it "is the adopted Comprehensive Plan." (Joint Stip. ¶ 23; JS Ex. 23, "Introduction to the Future Land Use Plan" Section, 2.) Footnote 1 details why this seeming inconsistency is a distinction without a difference when it comes to the consistency findings made by the City Council on October 16, 2018.

10

Committee and, since its adoption in 2009, it has been used by the City of Belfast as the guideline for potential and proposed amendments to City zoning ordinances and to provide policy direction on land use concerns. (Def.'s Supp.'g S.M.F. ¶ 8.)

The 2009 Future Land Use Plan established 20 "land use areas," which are not zoning districts but, according to the Future Land Use Plan, were "intended to serve as the general boundaries for future zoning districts." (Def.'s Supp.'g S.M.F. ¶ 9.) The 2009 Future Land Use Plan states that "these boundaries are intended to be overall guidelines" and that "the specific boundaries of one or more of the detailed land use areas may change." (Def.'s Supp.'g S.M.F. ¶ 10.) For each land use area identified, the 2009 Future Land Use Plan included an overall goal for the area; a description of past, current, and future land uses; examples of permitted uses; and recommendations for dimensional requirements, as well as other considerations. (Def.'s Supp.'g S.M.F. ¶ 11.) The 2009 Future Land Use Plan, which identified its recommendations as "policy" statements, acknowledged that there would need to be "flexibility in preparing Ordinance language to implement this policy" and "[t]his flexibility would apply but is not necessarily limited to policies such as the boundaries of proposed land use areas, the range of uses allowed, and recommended lot size, density and setback requirements." (Def.'s Supp.'g S.M.F. ¶ 12.) After 2009, the Planning Committee continued to work on revising and updating additional elements of the Comprehensive Plan. (Joint Stip. ¶ 24.)

In November of 2012, the Planning Committee submitted a recommended draft of a new portion of the Comprehensive Plan to the City Council to complement the 2009 Future Land Use Plan. (Joint Stip. ¶ 24.) At a December 18, 2012 City Council meeting, the City Council unanimously voted as follows regarding the draft 2012 Comprehensive Plan: "Councilor Lee, seconded by Councilor Sanders, made a motion to adopt the draft Comprehensive Plan and submit

11

it to the State, with the right to have further discussion and to make edits while it is being reviewed." (Joint Stip. ¶ 25.) The issue presented to the Council by the Planning Director for a vote was: "that the City Council adopt a motion to authorize the City to submit the 2012 Comprehensive Plan prepared by the City Comprehensive Planning Committee to the State Dept. of Agriculture, Forestry and Conservation." (Pl.s' Supp.'g S.M.F. ¶ 54(a).) The Planning Director explained to the Council that the State needed to review the draft Comprehensive Plan for consistency with the Growth Management Act. (Pl.s' Supp.'g S.M.F. ¶ 54(b).) He explained further that the Council will need to review the State's comments and then hold "a public hearing in late March or early April 2013 to adopt the Plan." (Pl.s' Supp.'g S.M.F. ¶ 54(c).) The State has found no record of the 2012 Comprehensive Plan ever being submitted for review, and the City has provided no record of a subsequent public hearing and final adoption of the draft 2012 Comprehensive Plan. (Pl.s' Supp.'g S.M.F. ¶ 54(f).) The Comprehensive Planning Committee has not met since 2012. (Joint Stip. ¶ 26.)

The City Council did not involve its Planning Committee in the process of developing or drafting the zoning ordinance amendments and the April 17, 2018 amendment to the Future Land Use Plan section of the Comprehensive Plan concerning the Nordic parcel. (Pl.s' Supp.'g S.M.F. ¶ 31; Def.'s Opp. S.M.F. ¶ 31.) After the March 20 City Council public hearing closed, a Councilor asked the Planning Director whether the Planning Committee should be involved in preparing the Comprehensive Plan amendments. (Pl.s' Supp.'g S.M.F. ¶ 34.) The Councilor cited comments made at the public hearing, as well as past practice. (Pl.s' Supp.'g S.M.F. ¶ 34.) The Planning Director responded to the Councilor by stating that he was confident that State law requirements were being satisfied, and the City Manager advised that the Council had the authority on its own to amend the Comprehensive Plan at any time. (Pl.s' Supp.'g S.M.F. ¶ 35.) There was no further

12

discussion on the point. (Pl.s' Supp.'g S.M.F. ¶ 35.)

4. Planning Board Involvement in the Ultimate October 16, 2018 Adoption of Zoning Ordinance Amendments after Plaintiffs Filed the Complaint, and the City Council's Findings of Consistency with Multiple Future Land Use Plan Sections of Versions of the Comprehensive Plan.

Planning Director Wayne Marshall is the liaison to the City Council and the Planning Board. (Def.'s Supp.'g S.M.F. ¶ 28.) He prepares all required public hearing notices, and causes them to be published and posted. (Def.'s Supp.'g S.M.F. ¶ 28.) On July 16, the City Planning Director informed the Planning Board that the City Attorney would meet with the Board on July 19 to discuss Plaintiffs' Complaint and a request to have the Board review the April 17 zoning ordinance amendments with a public hearing to be held in August.[6] (Pl.s' Supp.'g S.M.F. ¶ 43.) The Planning Board held a public hearing on August 15 on the April 17 zoning ordinance amendments. (Pl.s' Supp.'g S.M.F. ¶ 44.) On August 17, the Planning Director sent materials about the zoning ordinance amendments to the Board members in advance of their August 22 deliberation session. (Pl.s' Supp.'g S.M.F. ¶ 45.) On August 22, the Planning Director sent to the Planning Board three pages from the "Comprehensive Plan (Future Land Use Plan)." (Pl.s'

---

[6] The key zoning ordinance amendment for the Nordic proposal involved the creation of a Route 1 South Business Park district, which would be created by expanding the boundaries of the existing Industrial Park IV Perkins Road district (occupied by the Mathews Brothers property) to include the proposed Nordic property, and to exclude the twenty-four acres of resource-protected land the City would purchase. (Def.'s Supp.'g S.M.F. ¶ 33.) Plaintiffs denied this fact on the basis that "[t]he existing Industrial Park IV district does not exist in the Comprehensive Plan." (Pl.s' Opp. S.M.F. ¶ 33.) However, whether a proposed land use area exists in the policy guidance document that is the Future Land Use Plan section of the Comprehensive Plan, and whether a separate zoning ordinance exists that implements (or attempts to implement) the proposed land uses, are different questions. A review of the proposed land use areas in the 2009 Future Land Use Plan and the actual zoned districts that existed in the City as of early 2018 demonstrate that all zoned districts did not mirror the proposed land uses precisely. This is not surprising given that "[t]he 2009 Future Land Use plan . . . identified its recommendations as 'policy' statements, acknowledged that there would need to be 'flexibility in preparing Ordinance language to implement this policy[,]' and [stated that] '[t]his flexibility would apply but is not necessarily limited to policies such as the boundaries of proposed land use areas, the range of uses allowed, and recommended lot size, density and setback requirements.'" (Def.'s Supp.'g S.M.F. ¶ 12.) Because Plaintiffs' denial does not *actually* controvert Defendant's asserted fact 33, *see Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶¶ 10-11 & n.4, 824 A.2d 48, the fact is deemed admitted, *see* M.R. Civ. P. 56(h)(4).

13

Supp.'g S.M.F. ¶ 46.) On the same date, the City Attorney sent to the Planning Board a legal memorandum with his interpretation of the Law Court's "basic harmony" standard of consistency with a comprehensive plan. (Pl.s' Supp.'g S.M.F. ¶ 45.)

The City Attorney and the Planning Director directed the Planning Board to restrict its review to all the public record materials previously provided to the City Council on this topic, together with all materials and public comment provided in the City Council public hearings, including the video record of City Council meetings and hearings, and to refrain from independently researching or considering external information not provided in view of the public in the prior City Council or the Planning Board hearings. (Joint Stip. ¶ 31.) The City Planning Director and City Attorney submitted materials to the Planning Board about and relating to the April 17 Zoning, Shoreland Zoning, and Definitions ordinance amendments, and the City Comprehensive Plan; the Planning Board was directed to the entire video record of all the prior public written comments, and the Planning Board was directed to the video record on the City of Belfast website for prior City Council meetings and hearings on this topic. (Joint Stip. ¶ 32.)

After this review, the Planning Board members concluded that the zoning ordinance amendments were not fully consistent with the pre-April 17 Comprehensive Plan, with the exception of the Shoreland Zoning portion of the zoning ordinance amendments. (Joint Stip. ¶ 7(m); JS Ex. 13-009.) The Planning Board did, however, find the zoning ordinance amendments to be consistent with the April 17, 2018 amendments to the Comprehensive Plan. (Joint Stip. ¶ 7(m); JS Ex. 13-008.) Subsequently, on October 16, 2018, the City Council adopted motions approving two consistency findings: (1) that the October 16 zoning ordinance amendments were consistent with the April 17 Comprehensive Plan amendments; and (2) that the October 16 zoning ordinance amendments were consistent with the 2009 Future Land Use Plan as adopted in 2009.

14

(Pl.s' Supp.'g S.M.F. ¶ 50.)

## DISCUSSION

At the outset of the legal discussion section, the Court notes that Plaintiffs present a number of purported facts that arguably suggest the City Council had an improper motive for its conduct regarding its preliminary engagement with Nordic for the proposed Nordic Aquafarm. These purported facts are not material to the City Council's actions in this case because

> courts will not inquire into the motives of legislators in passing or doing an act, where the legislators possess the power to pass or do the act and where they exercise that power in a mode prescribed or authorized by the organic law. Therefore, *neither the motives of the members of a municipal legislative body nor the influences under which they act can be shown to nullify an ordinance duly passed in legal form, within the scope of their powers.* In such case the doctrine is that the legislators are responsible only to the people who elect them.

*Dobbs v. Me. Sch. Admin. Dist. No. 50*, 419 A.2d 1024, 1029 (Me. 1980) (quoting 5 McQuillin, *Municipal Corporations* § 16.90, at 287 (1970)). As the Court concludes below, the City Council possessed the power to amend the Future Land Use Plan section of the Comprehensive Plan on April 17, 2018. The Court will not discuss the negotiations with Nordic further, except to note that the actions done in executive session were authorized by the Freedom of Access Act. *See* 1 M.R.S. § 405(6)(C) (2018).

1. The City Council Properly Amended the Future Land Use Plan Section of the Comprehensive Plan on April 17, 2018.

Plaintiffs challenge the April 17, 2018 amendment of the Future Land Use Plan section of the City's Comprehensive Plan on the basis that the City Council did not engage the Planning Committee as purportedly mandated by 30-A M.R.S. § 4324. This requires the Court to engage in an exercise of statutory interpretation.

Statutory interpretation is a question of law. *See Town of Eagle Lake v. Comm'r, Dep't of*

15

*Educ.*, 2003 ME 37, ¶ 7, 818 A.2d 1034. The Court "look[s] to the plain language of the provisions to determine their meaning. If the language is unambiguous, [the Court] interpret[s] the provisions according to their unambiguous meaning unless the result is illogical or absurd. If the plain language of a statute is ambiguous—that is, susceptible of different meanings—[the Court] will then go on to consider the statute's meaning in light of its legislative history and other indicia of legislative intent." *Mainetoday Media, Inc. v. State*, 2013 ME 100, ¶ 6, 82 A.3d 104 (citations and quotation marks omitted). Here, the language of the pertinent provision is unambiguous.

The Maine Legislature has proscribed a process by which municipalities can adopt "a growth management program . . . ." 30-A M.R.S. § 4324(1). When a municipality initially "chooses to prepare a growth management program, the municipal officers of a municipality or combination of municipalities shall designate and establish a planning committee . . . ." *Id.* § 4324(2). Preparing a growth management program involves certain requirements, including citizen participation, such as public attendance at planning committee meetings, as well as publicly noticed and conducted hearings on proposed comprehensive plans. *Id.* § 4324(3), (4), (8). Once these procedures are followed, a "comprehensive plan or land use ordinance is considered adopted as part of a growth management program when it has been adopted by the municipality's legislative body." *Id.* § 4324(9).

Additionally, a municipality "may amend its existing comprehensive plan and existing land use ordinances to comply with the procedures, goals and guidelines established in [the Growth Management Program] subchapter." *Id.* § 4324(1). "When amending an adopted comprehensive plan, a municipality . . . shall follow the same procedures for citizen participation, public notice and public hearing that are required for adoption of a comprehensive plan." *Id.* § 4324(10). Plaintiffs contend this requires planning committee involvement. However, such a reading is

16

belied by the plain language of subsection 10.

The plain language of section 4324(10) does not contemplate planning committee involvement in *amendment* of comprehensive plans. The phrase "planning committee" is nowhere to be found in subsection 10. Had the Legislature wished to require that a planning committee be involved in the amendment process, it would have said so expressly. *Cf. State v. Bragdon*, 2015 ME 87, ¶ 9, 120 A.3d 103 ("Had it wished, the Legislature could have made the [5 M.R.S. §] 200-B procedure mandatory by saying that if the State seeks to obtain records from an ISP, then it must comply with the statute. Nothing in the language that the Legislature chose says that, however."); *Dudley v. Burns & Roe Constr. Grp.*, 2001 ME 161, ¶ 8, 784 A.2d 511 ("If the Legislature had intended to provide for a one-time per employee determination of the benefit cap in [39-A M.R.S. §] 211, it could have said so."); *Bowie v. Delta Airlines*, 661 A.2d 1128, 1131 (Me. 1995) ("If the Legislature had intended the time that an employee files for compensation benefits to be a decisive factor, it could have chosen specific language to do so."). Further, the Legislature would not have added subsection 10, *see* P.L. 1993, ch. 721, § A-2, if subsection 10 had no additional meaning beyond what was already required by the statute. *See Home Builders Ass'n of Me., Inc. v. Town of Eliot*, 2000 ME 82, ¶¶ 7-8, 750 A.2d 566 ("[I]t is well established that nothing in a statute may be treated as surplusage if a reasonable construction supplying meaning and force is otherwise possible. Surplusage occurs when a construction of one provision of a statute renders another provision unnecessary or without meaning or force." (citations and quotation marks omitted)). The original enactment of section 4324 undoubtedly contemplated that municipalities would amend comprehensive plans. *See* P.L. 1989, ch. 104, § 45.

Instead, the Legislature chose to require municipalities wishing to amend comprehensive plans to provide generally for the citizen participation, public notice, and public hearing

17

contemplated for original adoption of comprehensive plans, without the express requirement of planning committee involvement. When considering the plain language of section 4324(10) in conjunction with a municipality's home rule authority to "[d]o all other things necessary to carry out the purposes of [the Growth Management Program] subchapter," 30-A M.R.S. § 4323(3) (2018), the Court concludes that the City Council appropriately provided for the required citizen participation, public notice, and public hearing here. Prior to the April 17, 2018 amendment to the Future Land Use Plan section of the Comprehensive Plan, the City Council gave the proper notices of the amendments and related public hearings (Joint Stip. ¶ 8; JS Ex. 16-001 to JS Ex. 16-026.); held public hearings (Joint Stip. ¶¶ 7(d), (f), (g), (i), (j), 8, 33; JS Ex. 16-001 to JS Ex. 16-026; Def.'s Supp.'g S.M.F. ¶ 54.); and provided for citizen participation (Joint Stip. ¶¶ 7(j), 33; JS Ex. 9-001 to JS Ex. 9-241; Def.'s Supp.'g S.M.F. ¶ 54.). The Court concludes that the April 17, 2018 amendments to the Future Land Use Plan section of the Comprehensive Plan complied with the applicable laws and were validly adopted.

2. Plaintiffs' Challenge to the April 17, 2018 Zoning Ordinance Amendments Was Mooted When the City Council Properly Adopted the Zoning Ordinances on October 16, 2018, after Planning Board Review and Revision.

Plaintiffs challenge both the City Council's April 17, 2018 and October 16, 2018 adoption of the amended zoning ordinances. The Court makes no conclusions regarding the validity April 17, 2018 adoption of the amended zoning ordinances. That is because the issue of whether or not the City Council's actions were valid under the law in adopting the amended ordinances on April 17 is moot.

A claim becomes moot when it loses its "controversial vitality." *Int'l Paper Co. v. United Paperworkers Int'l Union*, 551 A.2d 1356, 1360-61 (Me. 1988). In other words, "a case is moot when the court cannot give any 'effectual relief' to the potentially prevailing party." *Horizon Bank*

18

*& Trust Co. v. Massachusetts*, 391 F.3d 48, 53 (1st Cir. 2004) (citing *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992)). "Courts should decline to decide issues which by virtue of valid and recognizable supervening circumstances have lost their controversial vitality." *In re Faucher*, 558 A.2d 705, 706 (Me. 1989) (quoting *State v. Gleason*, 404 A.2d 573, 578 (Me. 1979)). A declaration from the Court regarding the April 17, 2018 amendments to the zoning ordinances would provide no effectual relief to Plaintiffs because the City Council enhanced and replaced the April 17, 2018 amendments on October 16, 2018, after Planning Board review and revision. (Def.'s Supp.'g S.M.F. ¶ 55.) Thus, the Court reviews whether the City Council validly adopted the October 16, 2018 amendments to the zoning ordinances.

Much like the Legislature passed a statute governing comprehensive plans, so too did the Legislature pass a statute governing a municipality's adoption of zoning ordinances to regulate land use. *See* 30-A M.R.S. § 4352 (2018). That statute requires a municipality to give the public "an adequate opportunity to be heard in the preparation of a zoning ordinance." *Id.* § 4352(1). In order to provide adequate opportunity for the public to be heard, the statute sets certain timing requirements on the "municipal reviewing authority" to provide notice of the public hearings. *Id.* § 4352(9)(A)-(B). Special "[n]otice must be given" to the abutting landowners "when a municipality has proposed an amendment to an existing zoning ordinance or map that . . . has the effect of . . . permitting any industrial, commercial or retail uses where any of these uses is prohibited." *Id.* § 4352(10). The City's own pertinent ordinance further requires that "any changes proposed to the City's zoning ordinances or codes be reviewed by the Planning Board before being considered for adoption by the City Council." Belfast, Me., Code § 102-182 (July 7, 1998) City of Belfast website/Code of Ordinances/Land Use Regulation/Zoning/Amendments (last visited June 28, 2019). Here, the City of Belfast gave the public an adequate opportunity to be heard,

19

posted notices of the public hearings, gave the abutting landowners the required notice, and had the Planning Board review and propose additional changes to the proposed ordinances.

On August 15, 2018, the Planning Board received written and verbal comments and closed the public hearing portion of its review, and thereafter conducted deliberations on August 22 and September 5, 2018.[7] (Joint Stip. ¶ 7(*l*).) Notices of the Planning Board's August 15, 2018 public hearing were duly posted in accordance with the statute, including the special notice to the abutting landowners. (Joint Stip. ¶ 8; JS Ex. 16-002 to JS Ex. 16-003; JS Ex. 16-013 to JS Ex. 16-017.) Then, on September 12, 2018, the Planning Board concluded its drafting and deliberations and adopted its written recommendations to the City Council on Zoning, Shoreland Zoning, and Definitions ordinance amendments. (Joint Stip. ¶ 7(m).) It drafted additional standards for a permit requirement for any significant groundwater well. (Joint Stip. ¶ 7(m).) Next, on September 18, 2018, the Planning Board Chair and Planning Director presented to the City Council the Planning Board's recommendations for Zoning, Shoreland Zoning, and Definitions ordinance amendments. (Joint Stip. ¶ 7(n).) It also provided the City Council with the additional standards it drafted for a permit requirement for any significant groundwater well. (Joint Stip. ¶ 7(n).) It was then up to the City Council to adopt the ordinances following Planning Board review and revision.

---

[7] Plaintiffs take issue with the purported lack of material given to the Planning Board by the City Council, but the Planning Board received *all* the public record materials previously provided to the City Council on this topic, together with *all* materials and public comment provided in the City Council public hearings, including the video record of City Council meetings and hearings. (Joint Stip. ¶ 31 (emphases added).) The parties do not dispute that the City Council directed the Planning Board to refrain from independently researching or considering external information not provided in view of the public in the prior City Council or the Planning Board hearings. (Joint Stip. ¶ 31.) Nonetheless, it is not clear to the Court what illegality occurred by having the Planning Board review the entire public record that existed to that point, *in addition to* the Planning Board holding its own public hearing to gather more information. Plaintiffs take issue with the Planning Board not communicating with Nordic, a private corporation, but do not point to the public being restricted from participating in the Planning Board's review.

On September 25, 2018, the City Council conducted the first reading and public hearing of the Zoning, Shoreland Zoning, and Definitions ordinances, as well as the Significant Groundwater Well permitting ordinance as recommended by the Belfast Planning Board, and the City Council accepted the recommendation for said four ordinance amendments, which were later considered at the October 9, 2018 City Council hearing. (Joint Stip. ¶ 7(o).) Then, on October 9, 2018, the Belfast City Council conducted a second reading and second hearing regarding the Zoning, Shoreland Zoning, and Definitions ordinances, as well as the Significant Groundwater Well permitting ordinance as recommended by the Belfast Planning Board. (Joint Stip. ¶ 7(p).) Finally, on October 16, 2018, all of the Zoning, Shoreland Zoning, and Definitions ordinances, as well as the Significant Groundwater Well permitting ordinance as recommended by the Belfast Planning Board, were adopted by the City Council. (Joint Stip. ¶ 7(q).) The City of Belfast gave notice of the September 25 and October 9 hearings to both the public generally and the abutting landowners as required by the statute. (Joint Stip. ¶ 8; JS Ex. 16-003 to JS Ex. 16-004; JS Ex. 16-018 to JS Ex. 16-026.)

Based on the foregoing, the Court concludes that the City properly adopted the amendments of the pertinent zoning ordinances on October 16, 2018.

3. The City Council Properly Found the October 16, 2018 Amendments to the Zoning Ordinances to be Consistent with the April 17, 2018 Future Land Use Plan Amendments to the Comprehensive Plan.

Plaintiffs' challenge to the City Council's October 16, 2018 consistency findings is premised on their position that the April 17, 2018 amendments to the Future Land Use Plan are invalid, thus the consistency determination must be in regard to the 2009 version of the Future Land Use Plan. (Pl.s' Mot. Summ. J. 10-13.) However, the Court concluded in Section 1, *supra*, that the April 17, 2018 amendments to the Future Land Use Plan were valid. Thus, the Court

21

reviews the City Council's determination of consistency regarding the amended zoning ordinances adopted on October 16, 2018, with regard to the April 17, 2018 amendments to the Future Land Use Plan.

"A zoning ordinance must be pursuant to and consistent with a comprehensive plan adopted by the" municipality. 30-A M.R.S. § 4352(2). Because zoning is a legislative act, the Court must give deference to the legislative body at issue, here the City Council. *Remmel v. City of Portland*, 2014 ME 114, ¶ 12, 102 A.3d 1168. "When considering whether a rezoning action is consistent with a city's comprehensive plan, a court must determine whether the City Council could have, from the evidence before it, found that the rezoning was in basic harmony with the comprehensive plan." *Id.* ¶ 13 (quotation marks omitted). The Court cannot "substitute [its] judgment for that of the duly elected legislative body, the city council." *La Bonta v. Waterville*, 528 A.2d 1262, 1265 (Me. 1987) (alteration in original) (quotation marks omitted). Plaintiffs here "have the burden of showing inconsistency between the rezoning and the comprehensive plan." *Id.*

The Court concludes Plaintiffs have not met their burden to show that the October 16, 2018 amendments to several zoning ordinances are inconsistent with April 17, 2018 Future Land Use Plan. Plaintiffs argue inconsistency between the October 16, 2018 amendments to the zoning ordinances and the April 17, 2018 amendments to the Future Land Use Plan. (*But see* Def.'s Supp.'g S.M.F. ¶ 38; Pl.s' Opp. S.M.F. ¶ 38.)[8] The City Council concluded that the specific

---

[8] Although Plaintiffs "qualified" their response to Defendant's Supporting Statement of Material Fact 38, the very act of amending the Future Land Use Plan section of the Comprehensive Plan on April 17, 2018, was to establish the City's policy for the regulation of the land uses in the particular area. That included incorporating the Mathews Brothers property (previously earmarked as the "Business Park Area" in the 2009 version of the Future Land Use Plan and zoned as "Industrial IV Perkins Road" by the operative ordinance) into the newly created "Route One South Business Park Area" in the amended Future Land Use Plan section of the Comprehensive Plan (that would be zoned as "Route One South Business Park District" by renaming the "Industrial IV Perkins Road" ordinance and expanding the zone beyond the Mathews Brothers property to include the proposed Nordic property). (Joint Stip. ¶ 7(j); JS Ex. 10-011 to JS Ex. 10-016; JS Ex. 10-065; JS Ex. 10-069 to JS Ex. 10-072.) Because Plaintiffs' qualification does not actually

22

purpose of the April 17, 2018 amendments to the Comprehensive Plan was to establish formal policy direction in the 2009 Future Land Use Plan to explicitly support the expansion of the boundaries of the Business Park area and to foster the development of a major land-based salmon aquaculture farm and associated industrial uses proposed by Nordic Aquafarms; it made this conclusion when it made its finding of consistency regarding the April 17, 2018 amendments to the Future Land Use Plan and the October 16, 2018 amendments to several pertinent zoning ordinances. (Joint Stip. ¶ 7(r); JS Ex. 15-003.) Because Plaintiffs have not met their burden on this issue, the Court concludes, based on the evidence before the City Council, that the City Council had a rational basis that the October 16, 2018 amendments to the zoning ordinances "was in basic harmony with the [April 17, 2018 amendments to the] comprehensive plan." *Remmel*, 2014 ME 114, ¶¶ 13, 19, 102 A.3d 1168 (quotation marks omitted).

## CONCLUSION

For the more detailed reasons stated in the discussion above, the Court concludes that the City is entitled to judgment as a matter of law on Plaintiffs' declaratory judgment complaint.

The entry is:

1. Defendant the City of Belfast's Motion for Summary Judgment is **GRANTED**.
2. Plaintiffs Eleanor Daniels and Donna Broderick's Motion for Summary Judgment is **DENIED**.
3. Judgment in favor of the City of Belfast.
4. The Clerk is directed to incorporate this Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated: 7/10/19

Hon. Robert E. Murray
Justice, Maine Superior Court

---

controvert the asserted fact, *see Doyle*, 2003 ME 61, ¶¶ 10-11 & n.4, 824 A.2d 48, the fact is deemed admitted, *see* M.R. Civ. P. 56(h)(4).

23